Jean-Jacques Cabou (AZ # 022835)
Margo R. Casselman (AZ #034963)
**PERKINS COIE LLP**
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: +1.602.351.8000
Facsimile: +1.602.648.7000
JCabou@perkinscoie.com
MCasselman@perkinscoie.com
DocketPHX@perkinscoie.com

Thomas L. Holt (IL #6243134)
(*Pro Hac Vice* forthcoming)
**PERKINS COIE LLP**
110 North Wacker Drive, Suite 3400
Chicago, Illinois 60606-1511
Telephone: +1.312.324.8400
Facsimile: +1.312.324.9400
THolt@perkinscoie.com

*Attorneys for Plaintiff Footprint International, LLC*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Footprint International, LLC,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>Footprint Asia Limited; Eugene Chua; Shanghai Footprint Lvke Environmental Protection Technology Group Co., Ltd., doing business as G-COVE; Cary Newton and Jennifer Newton,<br><br>　　　　　Defendants. | No. CV _____<br><br>**MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT**<br><br>**(ORAL ARGUMENT AND EXPEDITED RULING REQUESTED)** |

## MOTION FOR PRELIMINARY INJUNCTION

Because Defendants are engaged in an ongoing multinational scheme to unlawfully co-opt Plaintiff Footprint International, LLC's ("Footprint") intellectual property and other confidential and proprietary information and equipment, and for the reasons detailed below, Footprint moves for a preliminary injunction against Eugene Chua, Chua's companies Footprint Asia Limited ("FPA") and Shanghai Footprint Lvke Environmental Protection Technology Group Co., Ltd. ("G-COVE"), and Cary Newton (collectively, "Defendants"). *See* Fed. R. Civ. P. 65. Footprint requests this Court issue an order (1) enjoining all Defendants (including any agents, affiliates, or others working under, through, or with them) from using, or inducing or assisting the use of, Footprint's federally protected trademarks or any confusingly similar mark for any purpose in commerce; (2) enjoining Chua and FPA (including any agents, affiliates, or others working under, through, or with them) from using, disclosing, copying, or divulging Footprint's confidential information or equipment (including Footprint's product designs and tools) in their possession or control for any purpose; and (3) ordering FPA to immediately return Footprint's tools to Footprint.

As detailed below, Footprint meets the requirements, under Federal Rule of Civil Procedure 65, for a preliminary injunction.[1] Footprint has established a strong likelihood of success on the merits. Specifically, Footprint has clearly shown that Defendants have unlawfully used and imitated Footprint's trademarks in violation of 15 U.S.C. §§ 1114 and 1125(a), and have used Footprint's confidential and proprietary information and equipment in violation of express contractual requirements.[2] Footprint has also shown that absent injunctive relief, it will continue to suffer irreparable harm to its business, reputation, and goodwill. Moreover, both the balance of equities and the public interest favor granting

---

[1] After filing, Footprint's counsel will immediately send to Defendants by electronic means (using email addresses that Footprint has regularly used to communicate with Defendants) a copy of Footprint's Verified Complaint, along with a copy of this Motion, and will follow up by email, telephone, and messaging applications using Defendants' and any counsel's known email addresses and phone numbers to ensure actual notice. *See* Ex. 3 (Euteneuer Decl. ¶¶ 6–12).

[2] Footprint only seeks preliminary relief on the claims specified in this Motion, though it asserts additional claims in the Verifpied Complaint.

-1-

Footprint's requested relief, which merely requires Defendants to abide by the law and to honor their contractual obligations.

**MEMORANDUM IN SUPPORT**

**I.      FACTUAL BACKGROUND**

    **A.      Footprint's Business and Marks**

Footprint is a leading materials science technology company based in Gilbert, Arizona. Compl. ¶¶ 2, 42. Footprint's mission is to eliminate single-use plastics, and it utilizes cutting-edge, proprietary methods and technologies to design, develop, and manufacture solutions to accomplish that mission. *Id.* ¶¶ 42–43; Ex. 13 (Footprint "About Us"). Today, Footprint employs over 2,000 people, and its customers include many household brands in food, consumer goods, and restaurants. *Id.* ¶ 46. Footprint's products—which are generally fiber-based and require applying proprietary processes and technologies—run the gamut from bowls, plates, cups, straws, and cutlery to supermarket food packaging and containers, and packaging for other goods ranging from toothbrushes to TVs. *Id.* ¶ 50. Footprint's products are marketed and sold under its brand name, "Footprint." *Id.* ¶ 51.

At the company's inception, Footprint adopted its distinctive logo featuring a foot, both alone and with the "Footprint" word mark, which it has used continuously since. *Id.* ¶ 52. In October 2021, Footprint also adopted its distinctive leaf logo, which it has also used continuously since, both alone and with the "FOOTPRINT" word mark. *Id.* ¶ 53. These word and design marks, examples of which are shown below, are collectively referred to in this Motion as the "Marks."

  

Footprint has invested significant resources to advertise, promote, and sell its products under the Marks—and to develop its Marks as symbols of Footprint's expertise, innovation, and quality. *Id.* ¶ 55. And indeed, the marketplace has recognized the reputation

of the Marks. As just one example, in July 2021, the Phoenix Suns and Phoenix Mercury arena in Downtown Phoenix was renamed the "Footprint Center" and now prominently features Footprint's Marks, as part of their collaboration to reduce plastic waste in the entertainment industry. *Id.* ¶ 56. Footprint also utilizes the Marks on its website, marketing, packaging, and all other aspects of its operations. *Id.* ¶ 62. Footprint has sold many millions of its products under the Marks and has expended significant efforts to protect its Marks, including federally registering them. *See id.* ¶¶ 55–67.

As a result of Footprint's efforts over the course of years, the Footprint Marks have become widely known and are assets of incalculable value as symbols of Footprint, its quality products and services, and its goodwill. *Id.* ¶ 70.

### B.   Footprint's Relationship and Contract with FPA and Chua

As Footprint has scaled its business, it has arranged for certain products to be manufactured at qualified factories in China. *Id.* ¶ 71. Defendant Chua is FPA's President/CEO, a member of its board, and—until recently—the 100% owner of FPA's shares. *Id.* ¶ 74; Ex. 5 (FPA Annual Return); Ex. 6 (FPA Return of Allotment). Footprint engaged Chua because he has relationships with multiple subcontractor factories in China that have the capability to produce certain fiber-based products. Compl. ¶ 72. In return for a negotiated price (and subject to various protections designed to protect Footprint's business, intellectual property, and customers), Chua and FPA arranged for certain Footprint products to be produced at these Chinese factories. *Id.* ¶ 73.

In December 2021, Footprint and FPA executed a written agreement titled "Master Supply Agreement" (the "MSA") to memorialize and govern their relationship. *Id.* ¶ 76; Ex. 3 (Euteneuer Decl.) ¶ 4; Ex. 3A (MSA). Effective as of October 2022, the parties executed an amendment to the MSA (the "Amendment"), to update (and bind the parties to) the Terms of Sale. *See* Compl. ¶¶ 77–78; Ex. 3B (Amendment), at Background and § 3; Ex. 3C (Terms of Sale). This Motion uses the term "Agreement" to refer collectively to the applicable terms of the MSA, Amendment, and Terms of Sale. The Agreement confirms that: (1) FPA is merely a contractor and has no ownership interest in any of Footprint's

products, trademarks, information, or other property; (2) FPA cannot use Footprint's name or any of Footprint's products, trademarks, or other property for any reason other than as directed by Footprint under the Agreement; and (3) FPA cannot independently solicit business, in competition with Footprint, from customers or other third parties to whom Footprint introduced FPA. *See* Compl. ¶¶ 80–82, 84; Ex. 3A (MSA) § 5 and Schedule 1 § 6; Ex. 3B (Amendment) § 4; Ex. 3C (Terms of Sale) §§ 12, 13, 19.

The Agreement also provides that FPA cannot disclose, use, modify, copy, reproduce, or otherwise divulge Footprint's Confidential Information—including (but not limited to) intellectual property, products, equipment, customers, markets, designs, and pricing—except as required by law or in furtherance of the Agreement. *See* Compl. ¶ 83; Ex. 3C (Terms of Sale) § 12. Importantly, the Agreement provides that improper use of such Confidential Information entitles Footprint to equitable relief, including provisional and permanent injunctive relief and specific performance, without a bond requirement. *Id.*

### C. Defendants' Unlawful Scheme

Through a series of recent deceptive and wrongful actions, FPA and Chua—working together with Newton and G-COVE—have breached the Agreement and the law. FPA has blatantly misused Footprint's property—including its confidential information, Marks, and product designs—and has essentially begun holding itself out as Footprint to compete directly with Footprint and usurp its customers. Compl. ¶ 87. This can be seen on FPA's website, https://asia-footprint.com/en/, which until recently featured the Marks prominently at the top of every page, and presently features (or, until very recently, featured) Footprint's Marks, products, advertising, customers, and accolades, thereby falsely and misleadingly suggesting that FPA is part of, and equivalent to, Footprint. *Id.* ¶¶ 89–93.

To facilitate the improper use of Footprint's intellectual and other property, the unlawful manufacture of products, and the diversion of Footprint's customers, FPA and Chua have worked together with former Footprint employees, the most notable of whom is Footprint co-founder Cary Newton, who worked for the company for nine years in various high-level executive roles—including as Footprint's top executive in the sales department.

*Id.* ¶¶ 94–97. Newton's role at Footprint involved building and managing Footprint's relationships with current and prospective customers and sales planning. *Id.* ¶ 98. While employed at Footprint, Newton also worked—and communicated directly—with Chua and FPA to facilitate the manufacture of Footprint products. *Id.* ¶ 101.

In April 2023, Newton resigned from his employment with Footprint and expressly stated that he had no interest in continuing to work in the sustainable packaging field because he was leaving to pursue a career in real estate. *Id.* ¶¶ 102, 104.

But Newton lied. Instead of leaving the industry, Newton organized a new company, Earth Pkg, LLC ("Earth Pkg"), and began working with an existing company, Navigate Brands LLC, dba Navigate CPG, to compete (unfairly) with Footprint, *all while he was still on the Footprint payroll as its top sales executive*. *Id.* ¶ 107; Ex. 4. Newton also started soliciting Footprint's customers and sought out Chua (and his FPA staff) to supply product to these customers. Compl. ¶¶ 109–11. Together, they solicited Footprint's customer contacts, created near-identical versions of Footprint's products utilizing Footprint's designs, tools, Marks, and confidential information without Footprint's permission, and manufactured, shipped, and sold the imitation products—bearing Footprint's Marks or confusingly similar marks—to multiple Footprint customers. *Id.* ¶¶ 112–13.

As to at least one such customer, Newton acknowledged in writing that they used Footprint's Marks on the labels affixed to the boxes in which the products were shipped, and Newton specifically instructed Chua for future shipments "to remove Footprint from the box" and "replace with" his new company's logo, and remove other identifiers on the label to "make it seamless with zero reference to [Footprint]." *Id.* ¶ 113; Ex. 10.

FPA and Chua have also formed additional entities to further the scheme and evade consequences, including Defendant G-COVE, which was founded (and is wholly owned) by Chua. Compl. ¶¶ 116–17, 121, 123. G-COVE operates a website, at https://www.g-cove.com/, where it advertises itself as a company dedicated to solutions that replace single-use plastics and advertises fiber-based, sustainable products similar to Footprint's products; uses Footprint's Marks; and falsely and misleadingly claims that FPA "developed

1  independently after inheriting FOOTPRINT." *Id.* ¶¶ 118–20; *see also* Ex. 7 (G-COVE "About Us"). The G-COVE website further misleads and confuses by including a list of well-known brands, including many current or former Footprint customers, and suggests that they are in "close contact" with G-COVE. Compl. ¶ 122. The G-COVE website also includes photographs of fiber-based products that look identical to Footprint products, including some that bear Footprint's Marks. *Id.* ¶ 127.

### D.     Specific Customer Examples

Footprint has recently uncovered numerous instances of Defendants' continued unlawful conduct directed at Footprint customers.[3]

#### 1.     Customers 1, 2, 3, and 5

As further detailed in the Complaint, Customers 1, 2, 3, and 5 are previously longstanding Footprint customers. *Id.* ¶¶ 130, 148, 158, 178. Historically, these customers purchased trays to package certain products sold at grocery stores (Customers 1 and 2), or bowls and lids used at restaurants (Customers 3 and 5), from Footprint on a repeat basis and in quantities of up to tens of millions per year. *See id.* ¶¶ 131, 149, 159, 179. Footprint engaged FPA to manufacture these products, providing FPA with the designs and customer-specific details (including, for example, the price point at which Footprint would sell its products to specific customers) necessary to facilitate the sales. *See id.* ¶¶ 132, 150, 160, 180; *see* Ex. 1 (Moore Decl.) ¶¶ 9–11. Recently, Defendants have directly solicited these customers and supplied them with counterfeit and imitation-Footprint products.

As to Customer 1, unbeknownst to Footprint, Newton solicited and accepted direct orders from Customer 1 for trays known as "2S" and "20S" trays beginning in *April 2023*, and he and Chua continue to supply Customer 1 to this day. Compl. ¶¶ 133–35, 144; Ex. 11. As recently as *this week*, Footprint employees found counterfeit Footprint Customer 1

---

[3] As detailed in the Complaint, Footprint refers to its customers via the numbers 1 through 6 to protect their confidentiality. Compl. ¶ 130 n.4. Footprint will promptly file a motion seeking to require that Defendants not publicly reveal these names, which are known to them, but which should not be filed in the public record. *See, e.g., BASCOM Global Internet Servs., Inc. v. AT&T Corp.*, 2017 WL 11490077, at *3 (N.D. Tex. July 31, 2017).

1    products at two Trader Joe's stores in Arizona, all of which bear indicia that they were
2    manufactured with the aid of Footprint's proprietary designs and tools, and some of which
3    even bear Footprint's Marks. Ex. 2 (Stevens Decl.) ¶¶ 7–9; Ex. 1 (Moore Decl.) ¶¶ 19–21.
4           As to Customer 2, Footprint introduced FPA and Chua directly to Customer 2 to
5    facilitate FPA's manufacture of Footprint products on Footprint's behalf. Compl. ¶ 150.
6    However, Customer 2 stopped ordering products from Footprint—and thus Footprint
7    stopped allowing FPA to manufacture products for Customer 2—in June 2023. *Id.* ¶ 151.
8    In September 2023, Footprint was notified that Customer 2 was selling certain products in
9    trays that resembled Footprint's and bore its Marks. *Id.* ¶ 153. These trays were not sold by
10   Footprint, and appeared to be lined with plastic, which is contrary to Footprint's corporate
11   mission regarding the elimination of single-use plastic. *Id.* ¶ 154.
12          As to Customer 3, FPA—through Chua and at the direction of Newton—directly
13   supplied bowls and lids to Customer 3 using Footprint's confidential information and
14   bearing Footprint's Marks, without Footprint's knowledge. *Id.* ¶¶ 161–62.
15          As to Customer 5, Footprint was similarly notified as recently as October 2023 that
16   products were being sold at a Customer 5 location, packaged in bowls that looked identical
17   to the ones Footprint (through FPA) previously supplied to Customer 5 bearing Footprint's
18   Marks. *Id.* ¶ 181. These bowls were not sold by Footprint to Customer 5. *Id.* ¶ 182.

19                  **2.     Customer 4**

20          Customer 4 was a prospective Footprint customer who requested that Footprint bid
21   for a new sales opportunity. *Id.* ¶ 166. To facilitate Footprint's bid, Customer 4 provided
22   detailed, proprietary, and confidential specifications about its product needs and
23   requirements. *Id.* To Footprint's knowledge, based upon information provided by Customer
24   4 to Footprint, Customer 4 was not soliciting bids from any other suppliers other than
25   Footprint for these products. *Id.*
26          Footprint provided Chua and FPA with Customer 4's confidential specifications and
27   asked FPA to provide its "best pricing" to Footprint for this customer to support this
28   opportunity. *Id.* ¶ 167. FPA did so, and claimed that the prices it provided to Footprint to

support the Customer 4 bid were "special price[s] for this project in order to win this large demand business." *Id.* ¶¶ 168–69. However, FPA then turned around and shared this information with a former Footprint employee who had gone to work for a competitor of Footprint. *Id.* ¶ 170. Working with FPA and others, the former employee eventually quoted the same products requested by Customer 4 at a cheaper price than the quotes that FPA had provided to Footprint for Customer 4. *Id.* ¶ 172. As a result of FPA's and Chua's conduct in breaching Customer 4's and Footprint's confidences, Customer 4 did not proceed to order products from Footprint. *Id.* ¶ 176.

### E. Unauthorized Use of Footprint's Designs and Tools

Footprint has provided FPA and Chua with hundreds of product designs under the Agreement, including designs that feature Footprint's Marks and many that are custom designs for particular Footprint customers. *Id.* ¶ 195. These designs are confidential, proprietary, and valuable to Footprint's business. *Id.* These designs also belong solely to Footprint, and FPA and Chua have no right to use them unlawfully or outside the scope of the Agreement. *Id.* ¶ 196; *see* Terms of Sale §§ 8, 12, 13.

In violation of the Agreement, FPA and Chua have taken at least twenty of these designs and submitted patent applications for them in China, falsely claiming that FPA (or Chua) invented or owns the designs. Compl. ¶ 197; *see* Terms of Sale §§ 8, 12, 13. FPA and Chua have also unlawfully—and in violation of the Agreement—used Footprint's designs to manufacture products for Footprint's customers without Footprint's permission, including, for example, for Customers 1, 2, 3, and 5 above. Compl. ¶ 198.

But there's more. Through the Agreement, FPA also had manufactured, based on Footprint's proprietary designs, and at Footprint's expense, over a hundred tools, which are specialized, commercial-grade molds used to manufacture Footprint's products according to its designs. *Id.* ¶ 199; Ex. 1 (Moore Decl.) ¶¶ 6, 8, 11. These tools, in the aggregate, are worth millions of dollars and belong solely to Footprint. Compl. ¶¶ 200–01; *see, e.g.*, Ex. 3C (Terms of Sale) §§ 8, 12, 13. FPA and Chua have violated the Agreement and used Footprint's tools to manufacture products for Footprint's (now former) customers without

permission, including, for example, for Customers 1, 2, 3, and 5 as detailed above. Compl. ¶ 202.

### F. Injury to Footprint and the Public

Footprint has suffered—and continues to suffer—significant harm to its Marks and associated goodwill because of Defendants' unauthorized and misleading use of Footprint's Marks in connection with the sale of infringing and counterfeit products. *Id.* ¶¶ 205–06.

Defendants have access to hundreds of Footprint's designs and tools, and extensive confidential information about Footprint's customers, products, and business, and have already gained a significant and unfair business advantage by (1) using this knowledge and access to unfairly compete against Footprint and divert Footprint customers and prospective customers and (2) usurping Footprint's Marks, branding, and goodwill to confuse and mislead customers and potential sources of supply and circumvent Footprint in the marketplace. *Id.* ¶¶ 207–08.

Multiple factories (potential supply sources) have *in fact* been confused as a result of Defendants' activities. *Id.* ¶ 208. If Defendants' actions are permitted to continue, Footprint faces imminent risk of losing additional customers and potential customers, which Footprint may never be able to reestablish, as well as further harm to the value of its Marks, brand, and goodwill. *Id.* ¶¶ 209–10. The future damages and intangible harms caused by Defendants' scheme will be difficult, if not impossible, to calculate. *Id.* ¶ 211.

## II. FOOTPRINT SATISFIES THE STANDARD FOR A PRELIMINARY INJUNCTION.

A court may grant preliminary injunctive relief when the movant establishes that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tip in his favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, "[a] preliminary

1  injunction is appropriate when the [movant] demonstrates . . . that serious questions going
2  to the merits were raised and the balance of the hardships tips sharply in the [movant]'s
3  favor . . . so long as the [movant] also shows that there is a likelihood of irreparable injury
4  and that the injunction is in the public interest." *Id.* at 1134–35 (citation omitted). Each of
5  these elements is satisfied here.

6        **A.**      **Footprint is likely to succeed on the merits of the claims on which it seeks preliminary relief.**

7              **1.**      **Defendants are infringing on Footprint's trademarks in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125.**

8

9                  **a.**      **Chua, FPA, and G-COVE ("The Asia Defendants")**

10 A claim for trademark infringement under 15 U.S.C. § 1114 requires proof of the
11 same elements as a claim for false designation of origin under 15 U.S.C. § 1125. *Brookfield*
12 *Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046 & n.6 (9th Cir. 1999)
13 (citing 15 U.S.C. §§ 1114(1), 1125; *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th
14 Cir. 1979), *abrogated in part on other grounds by Mattel, Inc. v. Walking Mountain Prods.*,
15 353 F.3d 792, 810 n.19 (9th Cir. 2003)). To prevail on these trademark claims, Footprint
16 must demonstrate (1) it has a protectible ownership interest in the Marks, and (2) the Asia
17 Defendants' use of the Marks is likely to cause consumer confusion. *Applied Info. Scis.*
18 *Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007). Footprint satisfies both elements.
19 As for the first element, Footprint's federal registration of three of its Marks is
20 "prima facie evidence of its ownership of the marks." *Dep't of Parks & Recreation for State*
21 *of California v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (citing 15
22 U.S.C. § 1057(b); 15 U.S.C. § 1115(a); *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d
23 1217, 1219, *as modified*, 97 F.3d 1460 (9th Cir. 1996)). Footprint can also demonstrate a
24 protectible ownership interest in its Marks (both registered and unregistered) by showing
25 the Marks are "used in conjunction with the actual sale of goods or services." *Rearden LLC*
26 *v. Rearden Com., Inc.*, 683 F.3d 1190, 1204 (9th Cir. 2012) (quoting *Brookfield Commc'ns*
27 *Inc.*, 147 F.3d at 1051). This "use in commerce" requirement may be met by showing an
28 "element of actual use" *and* an "element of display." *Rearden LLC*, 683 F.3d at 1204.

(quoting *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001)); *see also* 15 U.S.C. § 1127.

Footprint's Marks are extensively used on Footprint's products themselves (such as fiber-based bowls, supermarket trays, and cups), as well as on the labels, boxes, and other packaging used to ship Footprint's products in commerce. The Marks are also prominently used on or in Footprint's website, social media, advertising, media coverage, the Footprint Center, and other branding efforts. This has allowed the public to associate the Marks with Footprint. *Rearden LLC, Inc.*, 683 F.3d at 1204–05 (explaining the marks must be placed on the goods, the goods sold or transported in commerce, and the marks adequately displayed in public).

As for the second element, the standard test for a likelihood of confusion is "whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). Courts in the Ninth Circuit typically apply the eight factors set out in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, to determine whether a defendant's use of a mark or name creates a likelihood of confusion. These factors are not "rigidly weighed," but are "intended to guide the court in assessing the basic question of likelihood of confusion." *Dreamwerks Prod. Grp., Inc.*, 142 F.3d at 1129 (citation omitted).

First, Footprint is entitled to a presumption of confusion because such a presumption arises where, as here, "intent to cause confusion is coupled with the use of a counterfeit mark or a mark virtually identical to a previously registered mark." *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 945 (9th Cir. 2011). The Asia Defendants produced supermarket trays, designed to look exactly like Footprint's and bearing the words "Footprint" and "Pat FPpat Tech." Ex. 1 (Moore Decl.) ¶ 20. These trays—which were provided to Footprint customers through Newton's direct support and assistance—are virtually identical to those produced by Footprint and have led to confusion in the marketplace. *See, e.g.*, *Automated Pet Care Prod., LLC v. PurLife Brands, Inc.*, No. 22-CV-04261-VC, 2023 WL 3046592, at *4 (N.D. Cal. Apr. 21, 2023) ("Smarty Pear's intent

is transparent: Not only are the products themselves virtually identical, but the strategic use of the number three and the upper-case letters in its hashtags evinces an intent to capitalize on Whisker's goodwill."). Of course, the Asia Defendants also used actual or near-facsimiles of Footprint's name and Marks on their websites in a transparent effort to fool customers into thinking they are buying authentic Footprint products.

As further evidence of the Asia Defendants' intent to cause confusion, there is no doubt that they "adopted [their] mark with knowledge, actual or constructive, that it was another's trademark." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1167 (9th Cir. 2021) (explaining that intent to infringe may be demonstrated by knowledge of the marks). "When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1112 (9th Cir. 2016) (cleaned up). Here, it cannot be seriously disputed that FPA, Chua, and G-COVE knew about Footprint's Marks.

In addition to the presumption to which it is entitled, and though it need not satisfy every part to prevail, Footprint satisfies every factor of the *Sleekcraft* test:

1) Footprint's Marks, especially its distinctive, fanciful leaf logo and foot logo, are strong. *E.g. Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 445 (9th Cir. 1980);

2) Footprint's goods are closely related to (and in fact directly competitive with) FPA's goods. *E.g. Network Automation v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011) ("The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function.");

3) FPA's infringing marks are identical with or strikingly similar to the Marks;

4) There is evidence of actual confusion, including among multiple factories (potential sources of supply for Footprint), Compl. ¶ 208. Furthermore, confusion in the marketplace is also demonstrated by FPA and G-COVE featuring Footprint's name, logos, accolades, products, advertising, and customers on their websites, *see id.*

¶¶ 89–92, 118–27. *See, e.g.*, *Brookfield Commc'ns, Inc.*, 174 F.3d at 1057. "In the Internet context, in particular, entering a web site takes little effort," and marketplace confusion results because customers may incorrectly believe that FPA licensed "asia-footprint.com" from Footprint, or that Footprint otherwise sponsors FPA's or G-COVE's websites. *Id*. In fact, this misleading conduct has even created confusion among Footprint's own employees, *see* Ex. 1 (Moore Decl.) ¶ 22;

5) In large part because of Newton, the Asia Defendants have, perhaps among others, used precisely the same "marketing channels" for their products as Footprint does;

6) Unlike, say, a luxury handbag, the goods at issue here are inexpensive, commodity items purchased in bulk by stores and restaurants to sell their products to end users, and as such, these purchasing decisions are more susceptible to confusion. *See, e.g.*, *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1038 (9th Cir. 2010) ("[W]hen dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely.");

7) Even at the moment of filing, it is clear in this case that Defendants' intent in selecting and using their marks is to cause and benefit from confusion with Footprint. *See Alpha Indus., Inc.*, 616 F.2d at 446 ("If the latecomer adopts the name or mark deliberately to capitalize on the prior user's tradename and thus cause and benefit from confusion, that is an important factor in favor of finding the likelihood of confusion."); and finally

8) "[A] 'strong possibility' that either party may expand [its] business to compete with the other will weigh in favor of finding that the present use is infringing." *Urantia Found. v. Maaherra*, 895 F. Supp. 1338, 1346 (D. Ariz. 1995). That is certainly present here. The Asia Defendants and Newton have essentially decided to recreate Footprint's business as completely as possible, from tools, to products to customers. And that effort is ongoing.

In sum, Footprint has demonstrated that (1) it has a protectible ownership interest in the Marks, and (2) the Asia Defendants' use of the Marks is likely to cause consumer

1  confusion. Footprint is therefore likely to succeed on the merits of its trademark
2  infringement and false designation of origin claims as to the Asia Defendants.

### b. Defendant Newton

Having shown that the Asia Defendants infringed and counterfeited its Marks, Footprint will also succeed on its claims to hold Newton liable for his critical role in contributing to that unlawful conduct. *See Chloe SAS v. Sawabeh Info. Services Co*, No. CV1104147GAFMANX, 2014 WL 12599845, at *5 (C.D. Cal. Mar. 18, 2014). "Contributory infringement originates in tort law and stems from the notion that one who directly contributes to another's infringement should be held accountable." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996).

Before resigning from Footprint, Newton reached out to Chua to target Footprint's customers for solicitation and got FPA and Chua to manufacture and supply near-identical versions of Footprint's products to Footprint's customers. Newton therefore supplied infringing, counterfeit products to FPA "with knowledge that the infringer [was] mislabeling the particular product supplied." *Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x. 469, 473 (9th Cir. 2015) (citation omitted).

Contributory liability is also appropriate because "it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by" Newton, who offered direct access to Footprint's customers—customers that FPA and Chua would not have otherwise been able to reach. *Fonovisa, Inc.*, 76 F.3d at 264; *see* Compl. ¶ 114.

Footprint is therefore likely to succeed on its contributory infringement claims, too.

### 2. The Asia Defendants are unlawfully using Footprint's confidential information in violation of the Agreement.

Pursuant to Terms of Sale § 19(j), the Agreement at issue is "governed by and construed in accordance with the laws of the State of Delaware." Thus, Footprint must demonstrate (1) a contractual obligation, (2) a breach of that obligation by Defendants, and (3) resulting damage to Footprint. *E.g.*, *Greenstar, LLC v. Heller*, 934 F. Supp. 2d 672, 686

(D. Del. 2013). The Agreement executed between Footprint and FPA establishes that FPA is not permitted to use Footprint's name or any of Footprint's products, trademarks, information, or other property for any reason other than as directed by Footprint under the Agreement, nor can FPA independently solicit business, in competition with Footprint, from customers or other third parties to whom Footprint introduced FPA. Compl. ¶ 80. Furthermore, Chua, colluding with Newton, breached the Agreement by taking Footprint's confidential, proprietary product designs, tools, and Marks for their own purposes not "in furtherance of the Agreement" or "as required by law," including by producing imitation-Footprint products without permission for Customers 1, 2, 3, and 5, among potential others, and improperly transacting with those customers and soliciting Customer 4. *See generally id.* ¶¶ 87–203. Finally, these breaches have caused Footprint to lose revenue it otherwise would have received, and have also caused intangible harm to Footprint's brand, Marks, and goodwill by sowing confusion and misleadingly suggesting that FPA is equivalent to Footprint. *Id.* ¶¶ 204–05, 266–67.

### B. Without injunctive relief, Footprint faces irreparable injury.

Injunctive relief is the preferred remedy in trademark cases because "there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988). Here, Footprint has demonstrated the existence of a strong likelihood of confusion, and thus is entitled to a presumption of irreparable harm as to its infringement claims. 15 U.S.C. § 1116(a). In addition to that presumption, Footprint has demonstrated ongoing harm and continued threats to its brand and business interests, to its goodwill and reputation in the community, and to its customers—each of which support the conclusion that Footprint faces "a likelihood of irreparable injury," as to both its infringement claims and its breach of contract claim. *All. for the Wild Rockies*, 632 F.3d at 1135; *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").

1     As detailed above, Footprint has already lost Customers 1, 2, 3, and 4 as a result of Defendants creating competing businesses, misappropiating Footprint's proprietary and confidential information, Marks, designs, and tools, and soliciting Footprint's customers in contravention of the Agreement and the law. These are irreparable harms. *See, e.g.*, *First Found. Inc. v. Giddings*, No. SACV2000359, 2020 WL 2095810, at *4 (C.D. Cal. Feb. 28, 2020); *Starcom Mediavest Grp., Inc. v. Mediavestw.com*, No. 10-CV-04025, 2010 WL 3564845, at *1 (N.D. Cal. Sept. 13, 2010) (finding irreparable harm where defendant fraudulently contacted plaintiff's business partners and tricked at least one into an agreement).

Footprint has also demonstrated a clear impact to its reputation and goodwill. As just one example of reputational harm, the Defendants colluded to divert Customer 2 from Footprint and sold Customer 2 knockoff Footprint trays that were plastic-lined, which is directly contrary to Footprint's corporate mission to eliminate single-use plastic. *See* Compl. ¶¶ 151–57. Because the trays resemble Footprint's and bear the words "Footprint" and "FPpat Tech," they carry a high risk that consumers will be misled into thinking that Footprint is no longer creating sustainable products, thereby damaging Footprint's reputation in the marketplace. *Id.*; *see also* Ex. 1 (Moore Decl.) ¶¶ 5, 22.

**C.    The balance of the equities strongly favors Footprint.**

Footprint has shown knowing and intentional infringement and contractual violations by Defendants, and they "cannot [now] complain of the harm that will befall [them] when properly forced to desist from [their] infringing activities." *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) (internal quotation omitted).

Here, even if a preliminary injunction were to adversely impact Defendants, the balance of equities would still favor Footprint. "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration." *Id.* at 830 (cleaned up).

Conversely, Footprint will continue to suffer harm if a preliminary injunction is not issued and Defendants are free to continue to hold themselves out as a Footprint affiliate,

divert Footprint's former, current, and prospective customers, and produce counterfeit and imitation-Footprint products.

### D. An injunction is in the public interest.

Finally, "[t]he public interest favors elimination of consumer confusion caused by trademark infringement." *TMC Franchise Crop. v. Millennium Vision, LLC*, No. CV-10-2423-PHX-DGC, 2011 WL 65616, at *2 (D. Ariz. Jan. 7, 2011) (citation omitted).

As detailed throughout this Motion, Defendants' trademark infringement is actively breaching the Agreement and is causing consumer confusion. "While a contract between private parties ordinarily has no impact on the public, the specific provision at issue here implicates trademark law, the very purposes of which are to protect consumers from confusion and 'to protect the investment in a mark made by the owner.'" *TravisMathew, LLC v. Leisure Soc'y Unlimited, LLC*, No. SACV 12-213, 2012 WL 1463548, at *4 (C.D. Cal. Apr. 26, 2012) (quoting *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 873 (9th Cir. 1999)). The public interest is served by eliminating confusion as to whether the products they are receiving bearing the name "Footprint" are legitimately Footprint's sustainable creations. *AT&T Corp. v. Vision One SecuritySystems*, No. 95-0565, 1995 WL 476251, at *7 (S.D. Cal. July 27, 1995) ("Where defendant's concurrent use of plaintiff's trademark without authorization is likely to cause confusion, the public interest is damaged by the defendant's use.").

### III. CONCLUSION

For the reasons above, Footprint respectfully requests that the Court issue a preliminary injunction as described in the above Motion. Furthermore, among other reasons, because the Agreement provides that in case of its breach, Footprint "will be entitled to equitable relief (including without limitation provisional and permanent injunctive relief and specific performance) without the requirement to post any bond," Ex. 3C (Terms of Sale) § 12, Footprint urges the Court to grant the requested relief with no security required. Fed. R. Civ. P. 65(c).

| | | |
|---|---|---|
| 1 | Dated: January 12, 2024 | **PERKINS COIE LLP** |

By: */s/ Jean-Jacques Cabou*
    Jean-Jacques Cabou (AZ #022835)
    Margo R. Casselman (AZ #034963)
    2901 North Central Avenue, Suite 2000
    Phoenix, Arizona 85012-2788
    JCabou@perkinscoie.com
    MCasselman@perkinscoie.com

    Thomas L. Holt (IL #6243134)
    (*Pro Hac Vice* forthcoming)
    110 North Wacker Drive, Suite 3400
    Chicago, Illinois 60606-1511
    THolt@perkinscoie.com

*Attorneys for Plaintiff Footprint International, LLC*