**INDEX OF EXHIBITS
IN SUPPORT OF FOOTPRINT INTERNATIONAL, LLC'S
MOTION FOR PRELIMINARY INJUNCTION**

| Exhibit No. | Description |
|---|---|
| 1 | Declaration of Brandon Moore (January 12, 2024) |
| 2 | Declaration of Will Stevens (January 11, 2024) |
| 3 | Declaration of Collin Euteneuer (January 12, 2024) |
| 3A | Master Supply Agreement (December 8, 2021) |
| 3B | Amendment No. 1 to Master Supply Agreement (October 31, 2022) |
| 3C | Purchase Order Terms and Conditions (Goods and Services) (downloaded January 2, 2024) |
| 4 | Arizona Corporation Commission, *Articles of Organization of Earth Pkg, LLC* (March 21, 2023) |
| 5 | Hong Kong Companies Registry, *Annual Return*, Footprint Asia Limited (December 14, 2022) |
| 6 | Hong Kong Companies Registry, *Return of Allotment*, Footprint Asia Limited (July 1, 2023) |
| 7 | G-COVE, *About Us*, https://www.g-cove.com/About-Us.html (downloaded January 11, 2024) |
| 8 | Footprint Asia Limited, *Contact Us*, https://asia-footprint.com/en/contact-us/ (downloaded January 10, 2024) |
| 9 | G-COVE, *Contact Us*, https://www.g-cove.com/Contact-Us.html (downloaded January 10, 2024) |
| 10 | Document Bates stamped NEWTON000319 (5/1/2023 Email from C. Newton to E. Chua and S. Bao), produced in Maricopa County Superior Court Case No. CV2023-016885 (with redactions) |
| 11 | Document Bates stamped NEWTON002730 (11/30/2023 Emails between C. Newton, E. Chua, and S. Bao), produced in Maricopa County Superior Court Case No. CV2023-016885 (with redactions) |

| 12 | Document Bates stamped NEWTON002226 (5/12/2023 Email from E. Chua to C. Newton and others), produced in Maricopa County Superior Court Case No. CV2023-016885 |
| 13 | Footprint, *About Us*, https://www.footprintus.com/about (downloaded January 12, 2024) |

# Exhibit 3

## DECLARATION OF COLLIN EUTENEUER

I, Collin Euteneuer, state as follows:

1.     I am the Vice President, Project Management Office ("PMO") for Footprint International, LLC ("Footprint"), the Plaintiff in this case.

2.     I have a degree in Packaging Engineering from University of Wisconsin-Stout.

3.     In my role as Vice President, PMO and Previously Vice President, Customer Solutions for Footprint, I recently oversaw Footprint's sales and coordinated with various departments within Footprint to deliver solutions and products that meet our customers' needs and manage relationships with Footprint's customers.

4.     As part of that role, I am familiar with, and have worked with, Footprint's now-former supplier in China, Footprint Asia Limited ("FPA"). Through my work with FPA, I am familiar with the contract between Footprint and FPA, which consists of three components: (a) the "Master Supply Agreement" effective December 8, 2021 (the "MSA"); (b) "Amendment No. 1 to Master Supply Agreement" (the "Amendment") effective October 31, 2022; and (c) the "Footprint Standard Purchase Order Terms and Conditions" (the "Terms of Sale").

5.     Attached to this Declaration as **Exhibits A, B, and C,** respectively, are true and correct copies of the MSA, the Amendment, and the Terms of Sale between Footprint and FPA.

6.     As part of my work with Footprint, I have regularly communicated directly with FPA. My colleagues at Footprint have also frequently communicated with FPA. Due to the time zone differences, these communications are often sent by email, text message, or WeChat.

7.     Footprint's main and lead point of contact at FPA is FPA's President and CEO, Eugene Chua.

8. Footprint employees have regularly communicated with Eugene Chua for business purposes over the past several years by email, text messaging, telephone call, and WeChat messaging.

9. Mr. Chua's contact information that Footprint uses to communicate with Mr. Chua is as follows:

        a. Email address: eugene@asia-footprint.com & chua@footprint.asia

        b. Telephone number: +011 86 137 6120 8875

        c. WeChat ID: EugeneChua226

10. Most recently, on January 9, 2024, I and several of my Footprint colleagues received an email from Mr. Chua, which came from the following email address: eugene@asia-footprint.com.

11. Also, on December 24, 2023, I received a text message from Mr. Chua, which came from the telephone number listed above.

12. Footprint has also communicated with FPA and Mr. Chua by mail. The address Footprint uses to communicate with FPA for this purpose is: 1008, Building 7, SkyBridge SOHO, No. 968, Jinzhong Road, Changning District, Shanghai 200335.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12ᵗʰ day of January 2024.

Collin Euteneuer

-2-

Exhibit 3A

DocuSign Envelope ID: 322EA804-BDC6-4DF8-81F8-A03C187EF35F

## MASTER SUPPLY AGREEMENT

THIS MASTER SUPPLY AGREEMENT (this "Agreement") is made and entered into as of December ___, 2021 (the "Effective Date") by and between Footprint International, LLC, a Delaware limited liability company, with an address 250 E. Germann Road, Gilbert, Arizona 85297 ("Buyer"), and Footprint Asia Limited, a company incorporated in the People's Republic of China, with an address of 10D, Yu Jia Plaza, NO 168 Ping Wu Road, Changing District, Shanghai, 200052 ("Supplier") (each, a "Party", collectively, the "Parties").

WHEREAS, Supplier provides, through subcontract manufacturers, various products and tooling (individually and collectively, the "Products"); and

WHEREAS, Buyer is interested in ordering and purchasing Products from Supplier, and Supplier is willing to sell and supply to Buyer such Products upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and undertakings herein contained, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.  **Definitions**. In addition to any definition of any capitalized term set forth otherwise in this Agreement, including, without limitation, in any Schedule, the following terms shall have the following meanings:

"Affiliate" of a Party means any person or other entity that directly or indirectly controls, is controlled by, or is under common control with, such Party. For the purpose of this definition of "Affiliate," (i) "control" means owning, directly or indirectly, fifty percent (50%) or more of the beneficial or record ownership of the outstanding shares or other ownership interests of an entity, or having, directly or indirectly, the power to designate fifty percent (50%) or more of such entity's directors, managers, or individuals exercising authority in the governance of such entity, or having the sole or shared power to direct the policies of such entity, and (ii) "person" or "entity" means any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or any other entity.

"Term" means the duration of this Agreement commencing on the Effective Date and ending at the termination or cancellation of this Agreement pursuant to Section 7.

2.  **Order and Purchase of Product**

    2.1.  During the Term, Buyer shall order Products from Supplier through written purchase orders in the form provided by Buyer (each a "Purchase Order"). No Purchase Order shall be binding on Supplier until Supplier notifies Buyer in writing that the Purchase Order has been accepted.

    2.2.  Following prior written notice from Buyer to Supplier, Buyer may request that Supplier increase its "burst" capacity for certain Products to a daily run rate to accommodate Buyer's additional demand within ninety days of Buyer's written notice.

    2.3.  The Parties agree that all performance, rights, and obligations hereunder are subject to, and governed by, the Terms of Sale attached as Schedule 1 (the "Terms of Sale"), which are a part of this Agreement as though set forth at length herein. In the event of a conflict or inconsistency between

any of the Terms of Sale and any other provision of this Agreement, such Terms of Sale shall prevail.

**3.     Price**. In consideration for any Product ordered by Buyer from Supplier under Section 2, Buyer shall pay Supplier the price set forth in the applicable Purchase Order (the "Price"). Prices shall include sales, use, excise, customs, export, import, commodity, or similar taxes, or such taxes shall be included as a line item in the applicable invoice.

**4.     Subcontract Manufacturers.**

4.1.     Supplier shall contract with subcontract manufacturers ("Subcontractors") to produce the Products ordered by Buyer. Supplier shall ensure that each of the Subcontractors contractually guarantees to give Buyer's Purchase Orders (including purchase orders that Supplier issues to the Subcontractors on behalf of Buyer) the highest priority of all of its customers ("Buyer Priority"), meaning that after receiving a Purchase Order from Buyer or Supplier (on behalf of Buyer), the Subcontractor shall not produce an order for any other entity or individual before it finishes producing the Products contained in such Purchase Order. Additionally, Supplier shall ensure that each of the Subcontractors contractually guarantees to provide Buyer, or Supplier on behalf of Buyer, prices for the Products it produces that are no higher than the prices it provides for such Products to any other customer ("Best Pricing"). Supplier may agree to such other commercial terms with the Subcontractors as may be mutually agreed upon by Buyer and Supplier.

4.2.     In addition, Supplier shall ensure that all Subcontractors produce all Products: (i) in accordance with the Buyer's requirements and Product Specifications, and (ii) in accordance with all applicable laws, rules, and regulations.

4.3.     In addition to the foregoing, Supplier shall ensure that each of its Subcontractors comply with all applicable terms and conditions in this Agreement, and Supplier shall be primarily liable for the performance of each of its Subcontractors.

**5.     Confidentiality.**

5.1.     Each Party, including its Affiliates (collectively, the "Disclosing Party"), may disclose, provide, or make available Confidential Information to the other Party, including its Affiliates (collectively, the "Receiving Party"), under or in connection with this Agreement or the performance hereunder. "Confidential Information" means, individually and collectively, any information that is confidential or proprietary including, without limitation, intellectual property, inventions, trade secrets, know how, processes, designs, formulae, plans, business, customer and pricing information, financial information, data, documentation, and information in any form or medium disclosed, provided, or made available by the Disclosing Party to the Receiving Party, or obtained by the Receiving Party from the Disclosing Party, other than any information to the extent it is: (i) publicly known without fault or breach of duty by the Receiving Party; or (ii) developed, discovered, or created by or for the Receiving

2

DocuSign Envelope ID: 322EA804-BDC6-4DF8-84F8-A03C187EF35F

Party separately and independently from any Confidential Information of the Disclosing Party; or (iii) received or obtained by the Receiving Party from a third party not subject to any confidentiality, secrecy, or non-disclosure obligation owed to the Disclosing Party. Any Confidential Information including or to the extent related to the Products shall be deemed to be Confidential Information of Buyer only.

5.2.   The Receiving Party shall keep in confidence and shall not disclose or disseminate to any third party, and not use, any Confidential Information except solely as and to the extent and under the conditions expressly permitted in Section 5.3. The Receiving Party agrees that it will take and maintain measures to protect and safeguard any Confidential Information against disclosure or use not permitted under Section 5.3, to at least the same extent as the Receiving Party uses for its own Confidential Information but in no event less than is reasonable. The Receiving Party shall notify the Disclosing Party promptly of any access to or use or disclosure of any Confidential Information not expressly permitted under Section 5.3 or any other breach of this Section 5.

5.3.   The Receiving Party may use during the Term any Confidential Information provided by the Disclosing Party to it under this Agreement solely for any purpose for which such Confidential Information was provided to it under this Agreement. The Receiving Party may disclose such Confidential Information to any of its employees, Subcontractors, contractors, or legal, financial, or business advisors who need to know such information (collectively, the "Representatives") solely in connection with the permitted use of such Confidential Information by the Receiving Party as provided hereunder and further provided that such Representatives are then and shall continue to be subject to a written non-disclosure and confidentiality agreement providing at least as much protection of such Confidential Information as the terms set forth in this Section 5.

The Receiving Party shall be responsible for a breach of this Section 5 by any of its Representatives.

5.4.   If the Receiving Party, or any of its Representatives is required to disclose any Confidential Information of the Disclosing Party in an administrative or judicial proceeding, the Receiving Party shall (i) promptly notify the Disclosing Party of such requirement in writing prior to any such disclosure (unless applicable law prohibits prior notice, in which case the Receiving Party shall provide such notice to the Disclosing Party as soon as legally permissible), and (ii) reasonably assist the Disclosing Party, at the Disclosing Party's reasonable request, with the Disclosing Party exercising or asserting its legal rights or remedies to prevent such disclosure and/or to obtain a protective order against such disclosure. If the Receiving Party or its Representatives is nevertheless required to disclose any Confidential Information, it shall take reasonable efforts for the disclosure of such Confidential Information to be as limited as possible.

5.5.   Nothing in this Agreement or any performance is or shall be interpreted to give rise to any assignment, license, or other right in or to any

intellectual property rights of either Party or any of its Affiliates, including any related to the development or production of any Product, or any marks or Confidential Information of Buyer or its Affiliates.

5.6. In the event that the Buyer and the Supplier had previously entered into a confidentiality or non- disclosure agreement (the "Prior NDA"), the Prior NDA shall also remain in full force and effect; provided however that to the extent that there is a conflict between the terms of this Section 5 of this Agreement and the Prior NDA, the terms of this Agreement shall control.

## 6.   Limited Warranty; Audit Rights.

6.1. Supplier warrants for a period of one hundred eighty (180) days from delivery to Buyer that Products produced by Supplier or Subcontractors meet the written specifications of such Products set forth in the applicable Purchase Order or such other documentation provided by Buyer to Supplier (the "Product Specifications"), subject to the Terms of Sale. Supplier makes no warranty that the Products will work in combination with any other products. The foregoing warranty shall not apply to any Product(s) modified by any party other than Supplier, or any Product(s) for which the serial number or other identifying features have been removed or altered.

6.2. Buyer shall have the right to a reasonable audit of the Supplier not more than once per quarter, upon written notice, during Supplier's normal business hours to confirm Supplier's compliance with the terms and conditions of this Agreement (including, for the avoidance of doubt, the Terms of Sale). Supplier shall provide all reasonable documentation pertaining to this Agreement in support of such audit, subject to (i) compliance with the terms of the confidentiality obligations set forth herein, and (ii) for any exceptions for documentation that is attorney-client privileged, or is subject to other confidentiality obligations of Supplier.

## 7.   Term and Termination.

7.1. This Agreement commences on the Effective Date and will continue to be in effect (unless terminated earlier under Section 7.2) for a period of five years from the Effective Date (the "Initial Period") and shall automatically renew ninety (90) days prior to the end of the Initial Period or any Renewal Period (defined below) for successive one (1) year periods (each, a "Renewal Period") unless either Party terminates this Agreement by written notice of termination to the other Party, which written notice of termination is received by such other Party at least ninety (90) days before the end of the Initial Period or any Renewal Period or unless and until terminated in accordance with Section 7.2.

7.2. Either Party may terminate this Agreement by providing the other Party with written notice of termination in the event: (i) of a material breach of this Agreement, which material breach shall be identified in such written notice, and which termination shall become effective at the end of ninety (90) days of such written notice of termination unless such other Party

4

has fully cured such material breach by the end of such ninety (90) day period; or (ii) such other Party discontinues its business operations, takes steps to dissolve or cease to exist, admits its inability to pay its debts as they become due, files or is or becomes subject to a petition in bankruptcy (or similar reorganization proceeding) or makes a general assignment for the benefit of its creditors, or becomes subject to the appointment of a receiver, which termination shall be effective immediately.

7.3.   If, and to the extent that, at the end of the Term: (a) any Purchase Order for Product(s) has been placed by Buyer and not accepted by Supplier under this Agreement, Supplier has the right, in its sole discretion, but not the obligation, to accept such Purchase Order, in which case Supplier shall sell and supply such Product(s) under the terms of this Agreement; or (b) any Purchase Order for Product(s) has been placed by Buyer and accepted by Supplier under this Agreement, and any such Product(s) has not been supplied, Buyer may, as decided by Buyer in its sole discretion, (i) cancel such Purchase Order with proper notice, without penalty or liability of any kind (in which case Buyer shall not be liable for the Price for such Product(s)) or (ii) require Supplier to supply such Product(s) under this Agreement (in which case Buyer shall pay for such Product(s) under the terms of this Agreement).

## 8.   Indemnification and Limitation of Liability

8.1.   Supplier shall indemnify, defend and hold harmless Buyer, all of its Affiliates, and all owners, officers, directors, members, managers, and Representatives of Buyer or any of its Affiliates (collectively, "Buyer Group") from and against any and all claims, suits, actions, litigation, investigations, complaints, and proceedings of any kind, and any and all liability, damages, losses, judgments, orders, fines, penalties, costs, and expenses, including all attorneys' fees and defense and legal costs, arising from or in connection with or as a result of or related to (i) any product liability claim resulting from the use of Products, unless the product liability claim is attributable to Buyer's own acts, omissions, gross negligence or willful misconduct, or (ii) recall of the Products unless the recall is attributable to Buyer's own acts, omissions, gross negligence or willful misconduct.

8.2.   NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY, OR ANY THIRD PARTY UNDER ANY CIRCUMSTANCES FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE, LIQUIDATED, OR EXEMPLARY DAMAGES OR LOSSES (INCLUDING, WITHOUT LIMITATION, LOST PROFITS, LOSS OR DEPLETION OF GOODWILL, AND LOST BUSINESS OPPORTUNITIES), EVEN IF FORESEEABLE OR ANY OF THEM HAS BEEN ADVISED OF THE POSSIBILITY THEREOF, WHETHER AS A RESULT OF OR IN CONNECTION WITH ANY PRODUCT OR ITS USE OR UTILIZATION OF ANY KIND, THE AGREEMENT, OR ANY PERFORMANCE, ACT, OR OMISSION UNDER THIS AGREEMENT AND THE TERMS OF SALE. THE MAXIMUM LIABILITY OF BUYER, IN THE AGGREGATE, SHALL NOT EXCEED THE AMOUNT PAID BY BUYER TO SUPPLIER IN THE 12-MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH PARTY'S LIABILITY.

DocuSign Envelope ID: 322EA804-BDC6-4D58-8158-A03C487E535F

9.     **General**

     9.1.     Each right or remedy of either party under this Agreement is without prejudice to any other right or remedy of such Party whether under this Agreement or otherwise. Failure or delay by any party in enforcing or partially enforcing any provision of this Agreement or the Terms of Sale will not be construed as a waiver of any of its rights under this Agreement. Any waiver by any Party of any breach of, or any default under, any provision of this Agreement will not be deemed a waiver of any subsequent breach or default and will in no way affect the other provisions of this Agreement.

     9.2.     All notices, demands, or other communications to be given or delivered to a Party under or by reason of a provision of this Agreement shall be in writing and shall be deemed to have been given to such Party when delivered personally to such Party at, or sent to such Party by reputable overnight international express courier service (charges prepaid) or email, to such Party's address set forth in the caption of this Agreement or another address notified hereunder in writing at least thirty (30) days before such notice, demand, or other communication by such Party to the other Party, addressed to the attention of the Parties as set forth below:

If to Supplier:

_____

_____

E- mail:

If to Buyer:

Footprint International, LLC
250 E. Germann Road
Gilbert, AZ 85297
Attention: Jeff Bassett, SVP of Sales
E- mail: Bassett@footprintus.com

and

Footprint International, LLC
250 E. Germann Road
Gilbert, AZ 85297
Attention: Brett Slaughter, SVP of Procurement
E- mail: Slaughter@footprintus.com

DocuSign Envelope ID: 322EA804-BDC6-4D58-8158-A03C487E535E

And a copy to

Footprint International, LLC
250 E. Germann Road
Gilbert, AZ 85297
Attention: Stephen T. Burdumy, Managing Director and Chief Legal Officer
E-mail: Burdumy@footprintus.com

9.3.    If and to the extent that any provision of this Agreement, or any part thereof, is found by any court, tribunal or agency to be wholly or partly illegal, invalid, void, voidable, or unenforceable, it (i) shall be deemed replaced by a provision that is valid and enforceable and comes closest to expressing the intention of such replaced provision, and (ii) shall otherwise be deemed severable and the remaining provisions or remaining part shall continue in full force and effect.

9.4.    The Parties do not intend any third party to be a beneficiary under this Agreement, or any sale, purchase, or transaction hereunder, and nothing in this Agreement shall be construed for any third party to be a third-party beneficiary or to confer any third-party beneficiary rights or status on any third party.

9.5.    The provisions of Section 5, 6.1, 7.1, 7.3, 8, and 9.6 of this Agreement, and the Terms of Sale shall survive the end of the Term (and any termination of this Agreement) for any reasons.

9.6.    This Agreement, and the interpretation and construction of this Agreement, and the validity, enforceability, and performance of this Agreement, and any dispute under this Agreement and the resolution of any dispute under this Agreement, shall be governed by the law of the State of Arizona, and any applicable U.S. federal law, without the application of any conflicts of law provisions that would result in the application of the law of a different jurisdiction. The U.N. Convention on the International Sale of Goods, if and to the extent applicable, is hereby disclaimed and shall not apply to this Agreement or any transaction thereunder. Any action arising under or related to this Agreement shall be vested exclusively in the State of Arizona or the U.S. federal courts sitting in the State of Arizona. Each Party expressly and irrevocably consents and submits to, and waive any objection to, the jurisdiction of the State of Arizona or the U.S. federal courts sitting in the State of Arizona having appropriate subject matter jurisdiction in connection with any such legal proceeding.

[Signature page follows]

IN WITNESS WHEREOF, each Party has executed this Agreement as of the Effective Date.

BUYER:                                        SUPPLIER:

Footprint International, LLC                   Footprint Asia Limited

By: _____                 By: _____

Name: Troy Swope                              Name: EUGENE CHUA

Title: CEO                                     Title: CEO

8

Schedule 1

Terms of Sale

1.    APPLICATION; DEFINITIONS

a.   These Terms of Sale (these "Terms") govern the sale of any Products that Buyer orders from Supplier, and Buyer's order and purchase of all Products from Supplier, including through any order and purchase placed by a distributor of Buyer. These Terms, together with any Purchase Order issued by Buyer (or by a distributor of Buyer) and the Master Supply Agreement between Buyer and Supplier, to which these Terms are attached or into which these Terms are incorporated by reference, constitute the agreement for Buyer's order and purchase, and Supplier's sale and supply, of Products (collectively, the "Agreement"), provided that, in the event of an inconsistency between any of these Terms and any provision of such Purchase Order or the Agreement or any other document referenced or identified therein or submitted by Supplier (including any terms or conditions of Supplier), these Terms shall prevail.

b.   Any order and purchase by Buyer, and any sale, supply, and delivery of any Product by Supplier, and all performance, rights, and obligations related thereto or in connection therewith, are under and subject to, and governed by, these Terms and any other provision of the Agreement (subject to the conflicts provisions in Section 1.a of these Terms) – to the exclusion of all other terms and conditions (including any terms or conditions which Supplier proposes or purports to apply in any form, including under any Purchase Order, confirmation of order, specification, or other document or communication), all of which are hereby rejected and none of which shall be part of the Agreement or apply, unless the Parties otherwise explicitly agree. These Terms and any other provision of the Agreement (subject to the conflicts provisions in Section 1.a of these Terms) set forth the complete and entire agreement and understanding between Supplier and Buyer regarding the order, purchase, sale, supply, and delivery of Product, and performance related thereto and shall replace any prior agreement, term sheet, or other agreement between the Supplier and Buyer related thereto, provided that any Prior NDA shall remain in full force and effect, as set forth in Section 5.6 of the Parties' Master Supply Agreement.

c.   In addition to any other definitions in these Terms, the terms: (i) "Parties" means collectively both, and "Party" means individually each, of Supplier and Buyer; (ii) "Product" means any good ordered by Buyer under the Agreement.

2.    PURCHASE ORDERS. Each Purchase Order submitted by Buyer shall be deemed to be an offer by Buyer to purchase such Product from Supplier subject to these Terms. Buyer is solely responsible for ensuring that the details of its Purchase Order, including identification of the Product and quantity, are complete and accurate and will be bound by the Purchase Order with the details set forth therein. No Purchase Order placed by Buyer shall be deemed to be accepted by Supplier until Supplier provides a written acceptance of such order to Buyer.

3.  PRICE; PAYMENT

a.  Buyer shall pay to Supplier for all Product(s) ordered under the Agreement the price for such Products(s) set forth in the applicable Purchase Order(the "Price"). The Price shall include all shipping, freight, transshipment, loading, unloading, delivery, storage, warehousing, insurance, and other costs, expenses, charges, taxes, customs duties, tariffs and fees of any kind resulting from or arising out of or in connection with the shipment, order, sale, purchase, or delivery of any Product ("Costs") and any sales, services, value added, and other taxes, imposts, and duties of any kind tax arising from or in connection with the order, sale, purchase, supply, shipment, or delivery of Product (or payment of the Price (excluding only any income taxes assessed against Supplier for selling the Product(s)) ("Taxes"). Such Costs and Taxes shall be included as separate line items in the applicable invoices.

b.  Buyer shall pay the Price and all Costs and Taxes, if any, owed to Supplier, and such payment shall be due to Supplier within thirty (30) days after Supplier's issuance of an invoice for such Price, Costs, and/or Taxes, or such other payment period agreed to by the Parties for a particular Purchase Order, other than any amounts which Buyer disputes in good faith within such 30 day period.

c.  Each payment to Supplier of the Price, Cost and/or Taxes for the Products shall be made in immediately available, unconditional and irrevocable funds in U.S. dollar currency.

4.  SHIPPING AND DELIVERY; INSPECTION; ACCEPTANCE

a.  All Product is sold, shipped and supplied by Supplier or its Subcontractors from Supplier or Subcontractor's facility  to the address provided by Buyer in its Purchase Order for such Products or such other final location that Supplier agrees to ship such Products (the "Destination"). Supplier may use any reasonable means of shipment to ship Products to the Destination. Supplier shall have fulfilled all of its shipping, delivery, supply, and tender obligations regarding the Products upon the Products delivery to the Destination.

b.  The time and date agreed by Supplier for shipment and delivery of Products is binding, and time is of the essence with respect to any such shipment and delivery. Supplier shall be  responsible and liable for any non- delivery or delay of any Products, any shipment, and any part thereof.

c.  Buyer shall be deemed to have received and taken delivery of Product(s) once shipment of such Product(s) arrives at the Destination ("Receipt"). All Product shall be shipped in accordance with the Product Specifications. Upon Receipt of Products, Buyer shall conduct a reasonable inspection of such Products to verify any Non- Conformance, and such inspection may occur at any time. "Non- Conformance" means, with regard to Product(s) ordered by Buyer, any failure of the Product to conform with the Product Specifications or quantity contained in the applicable Purchase Order, or (ii) be of a quality that meets Buyer's reasonable expectations and/or specifications, or if the Product otherwise has any damage, destruction, defect, loss or other non- conformity

of such Products, including whether any sealed packaging or wrapping of Products is broken or subject to tampering. Buyer shall notify Supplier in writing of any Non-Conformance, identifying such Non-Conformance in reasonable detail. Buyer shall be deemed conclusively to have accepted any Product if or to the extent that Buyer fails to provide Supplier with such written notice. Buyer shall have the burden to prove the Receipt, the date of Receipt of any Product(s), and to establish the Non-Conformance, in each case through written documentation. If and to the extent that Buyer provides reasonable evidence of such Non-Conformance, Supplier's liability and obligation related thereto shall be, at Buyer's discretion, either refunding Buyer for the amount paid for such Products that contain any Non-Conformance or  replacing such Products subject to such Non-Conformance, or, if such Non-Conformance relates to a missing quantity of Products, at Buyer's option, (i) by Supplier shipping such missing quantity of Products to Buyer hereunder, or (ii) issuing a credit note for the Price of such Products against any invoices issued by Supplier for Buyer's order for such Products.

5.     **RISK AND TITLE.** The risk of loss for any Product shall transfer to Buyer at, and Buyer shall bear the full risk of loss for any Product from, the time at which Buyer, whether itself or its distributors, takes possession of such Product at the Destination. For the avoidance of doubt, Supplier shall, as between Supplier and Buyer, retain risk of loss for any Product until such time as Buyer takes physical possession of such Product at the Destination.  Title to any Products shall transfer to Buyer upon: (a) Buyer's payment for such Products or (b) the transfer of the risk of loss for such Products to Buyer as set forth above, whichever is earlier.

6.     **INTELLECTUAL PROPERTY RIGHTS.** Nothing in or under these Terms or the Agreement or any performance thereunder and hereunder is or shall be interpreted to be or give rise to any, or a right or agreement for any, assignment, transfer, conveyance, license, lien, claim, or other right, to or in favor of Supplier or any Subcontractor, in or to any intellectual property, intellectual property rights, inventions, trade secrets or know-how of Buyer or any of its Affiliates, including any related to the development or production of any Product, equipment, tooling or processes, or any marks, names or confidential information (collectively, "Buyer Intellectual Property") of Buyer or its Affiliates, all of which Buyer Intellectual Property shall remain the sole and exclusive property of the Buyer and its Affiliates. Supplier shall take all measures and actions reasonably necessary to protect and defend the Buyer Intellectual Property.

7.     **BUYER RESPONSIBILITY.** Buyer is solely and only responsible for its use, utilization, possession, processing, handling, storage, offer, sale, resale, consumption, and disposal of any Product(s) after transfer of the risk of loss thereof. Buyer hereby represents and warrants that all such use, utilization, possession, processing, handling, storage, offer, sale, resale, consumption, and disposal will be in accordance with, and will not violate, any law.

8.     **LIMITED WARRANTY.** Supplier warrants to Buyer, for a period of one hundred eighty (180) days from Buyer's Receipt of any Product at the Destination, that any Product sold by Supplier to Buyer, at the time that the risk of loss to such Product transfers to Buyer under these Terms,  conforms to any written specifications of such Product expressly set forth in the Agreement as a "Product Specification".

9.     **REMEDIES.** Supplier's sole and exclusive liability, responsibility, and obligation in the event of any Non-Conformance of any Product is, if such Non-Conformance constitutes a

DocuSign Envelope ID: 322EA804-BDC6-4D58-8158-A03C487EF35E

breach of Supplier's warranty with regard to such Product, as set forth in Section 4.c of these Terms of Sale, provided that Buyer retains the right to terminate the Agreement in accordance with Section 5 of the Master Supply Agreement. In no event shall Supplier be liable, responsible, or obligated for any Product with a Non-Conformance in the event (i) that Buyer makes any further use of such Product after such Non-Conformance is discovered, known, or should be known by Buyer; or (ii) of any failure by Buyer to follow Supplier's directions regarding such Product; or (iii) of any gross negligence, willful misconduct, or violation of law by Buyer.

10.   **INDEMNIFICATION; LIMITATION OF LIABILITY.** The provisions of Section 8 of the Parties' Master Supply Agreement shall apply to these Terms.

11.   **LEGAL RESTRICTIONS.** In the event, and solely to the extent, that any part or provision of Sections 7, 8, 9, or 10 of these Terms is invalid or unenforceable under the applicable law of any particular state, country or jurisdiction, for the purpose of such state, country or jurisdiction only, such part or provision shall be interpreted or deemed revised so as to be valid and enforceable under such law while preserving, to the greatest permissible under such law, the disclaimers, exclusions, limitations, or shifting set forth in such Sections 7, 8, 9, or 10, as applicable.

12.   **FORCE MAJEURE.** Neither Party shall not be in breach of its obligations under the Agreement, or otherwise be liable to the other Party, by reason of any delay in performance, or non-performance, of any of its obligations under the Agreement to the extent that such delay or non-performance is due to acts of God, war or national emergency, acts of terrorism, protests, riots, fire, explosion, or flood (a "Force Majeure Event").

13.   **ETHICAL PRACTICES.**

a.    Each of Buyer and Supplier shall comply fully with all applicable foreign or domestic anti-corruption and anti-bribery laws and regulations (as amended from time to time), including, but not limited to, the United States Foreign Corrupt Practices Act 1977, the UK Bribery Act 2010, and any laws intended to implement the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions. Neither Buyer nor Supplier shall make, authorize, offer or promise to make or give any money or any other thing of value, directly or indirectly, to any current or former government official or employee (including employees of a state-owned or controlled enterprise of public international organization), candidate for political office or an official of a political party, or any employee, director, agent, or consultant of a non-government client or potential client, for the purpose of securing any improper or unfair advantage or obtaining or retaining business in connection with the activities contemplated under this Agreement. Any breach or violation of any provision contained in this Section 13 by Buyer or Supplier (as applicable) shall be grounds for immediate termination of this Agreement by the other party.

b.    At all times during the Term hereof, Supplier shall, and Supplier shall ensure all Subcontractors, to abide by the Buyer's Supplier Code of Conduct at https://www.footprintus.com/hubfs/documents/footprint-supplier-code-of-conduct-051221-final.pdf, as may be amended from time to time.

DocuSign Envelope ID: 322EA804-BDC6-4D58-8158-A03C487E535E

14. **GENERAL**

a.   Each right or remedy of either Party under the Agreement is without prejudice to any other right or remedy of such Party whether under the Agreement or otherwise. Failure or delay by such Party in enforcing or partially enforcing any provision of these Terms or the Agreement will not be construed as a waiver of any of its rights under the Agreement. Any waiver by any Party of any breach of, or any default under, any provision of the Agreement by the other Party will not be deemed a waiver of any subsequent breach or default and will in no way affect the other provisions of the Agreement.

b.   If and to the extent that any provision of the Agreement, or any part thereof, is found by any court, tribunal or agency to be wholly or partly illegal, invalid, void, voidable, or unenforceable, it (i) shall be deemed replaced by a provision that is valid and enforceable and comes closest to expressing the intention of such replaced provision, and (ii) shall otherwise be deemed severable and the remaining provisions or remaining part shall continue in full force and effect.

c.   The Parties do not intend any third party to be a beneficiary under the Agreement (other than any distributor), or any sale, purchase, or transaction hereunder, and nothing in the Agreement shall be construed for any third party to be a third-party beneficiary or to confer any third party beneficiary rights or status on any third party.

d.   Section 9.6 of the Parties' Master Supply Agreement shall apply to these Terms.

e.   In the Agreement: (i) any reference to any provision of law shall be construed as a reference to that provision as amended, re-enacted or extended at the relevant time; (ii) the term "including" to the extent used in these Terms means "including, without limitation" or "including, but not limited to"; (iii) the principle ejusdem generis shall not apply to any provision in these Terms; (iv) the provisions shall not be interpreted against the drafter, and for purposes of any interpretation, both Parties shall be deemed to be drafters of the Agreement; (v) where the Agreement states that a Party "shall" or "will" perform, act, or omit to act, it means that such Party is legally obligated to do so in accordance with the Agreement; (vi) all article and section headings or titles herein are intended solely for the convenience of the Parties, and none will be deemed to affect the meaning or construction of any provision hereof; and (vii) words of any gender used in the Agreement are intended to include any other gender, and words in the singular number include the plural, and vice versa, unless te context clearly indicates otherwise.

Exhibit 3B

## AMENDMENT NO. 1 TO MASTER SUPPLY AGREEMENT

This **Amendment Number 1** ("Amendment") to the Master Supply Agreement dated 8 December 2021 ("**Original Agreement**"), is effective as of **31 October 2022** ("Amendment Effective Date"), and entered into by and between **Footprint International, LLC** ("Footprint" or "Buyer"), and **Footprint Asia Limited** ("Supplier" or "Seller"), either or both of which may be referred to as a "Party," or the "Parties," respectively.

### BACKGROUND

The Parties desire to amend the Original Agreement to update the Terms of Sale to incorporate Buyer's standard purchase order terms and conditions, and the additional terms and conditions set forth in this Amendment.

### AGREEMENT

The Parties amend the Original Agreement as follows:

1. Section 2 of the Original Agreement, titled "Order and Purchase of Product" is deleted in its entirety and replaced with the following:

   "**2. Order and Purchase of Product**

   2.1     During the Term, Buyer will order Products from Supplier through written purchase orders in the form provided by Buyer (each a "Purchase Order"). Additionally, the Parties may, from time to time as Buyer determines necessary or appropriate, execute a Business Award that sets forth additional terms and conditions applicable to the Products, including pricing, estimated volumes, and any applicable specifications, supplements, schedules, or other terms and conditions (each, a "BA"). Each Purchase Order will be governed by the Terms of Sale and any BA applicable to the Products. In the event of a conflict or inconsistency between any of the Terms of Sale, the BA, or any other provision of this Agreement, the following order of precedence will apply: (1) the applicable BA; then (2) The Terms of Sale; and finally, (3) any other term or condition of this Agreement.

   2.2     Supplier accepts each Purchase Order issued by Buyer by (i) acknowledging the Purchase Order in writing; or (ii) beginning performance under such Purchase Order. By acceptance of a Purchase Order, Supplier agrees to comply with all terms and conditions of this Agreement and any additional terms and conditions set forth in the BA.

   2.2     Following prior written notice from Buyer to Supplier, Buyer may request that Supplier increase its "burst" capacity for certain Products to a daily run rate to accommodate Buyer's additional demand within ninety days of Buyer's written notice."

2. Section 3 of the Original Agreement, titled "Price" is deleted in its entirety and replaced with the following:

   "**3.   Price.** In consideration of any Products ordered by Buyer from Supplier under Section 2, Buyer will pay Supplier the price set forth in the applicable Purchase Order, which must match any pricing agreed in a BA, if applicable (the "Price"). Prices shall include sales, use, excise, customs, export, import, commodity, or similar taxes, or such taxes shall be included as a line item in the applicable invoice."

3. The terms and conditions of Schedule 1 of the Original Agreement, titled "Terms of Sale," are deleted in their entirety and replaced with the terms and conditions of the Footprint Standard Purchase Order Terms and Conditions, available at https://www.footprintus.com/purchase-order-terms, as may be amended from time to time ("Terms of Sale").

4. The Parties agree that the following additional terms and conditions will apply to the Parties and are included in the Terms of Sale:

   Quality Control.
   a. Seller will establish and maintain a quality control system acceptable to Buyer for the Goods and Services provided under the Agreement. At a minimum, the quality control system must include the following: (i) assuring that the Goods and Services comply with all (a) requirements communicated by Buyer, including all specifications and designs; and (b) applicable laws, regulations, and other requirements of Buyer; (ii) conducting audits, on a schedule acceptable to Buyer, of all activities related to the Goods and Services provided under the Agreement; and (iii) ensuring that the requirements of Buyer and the Agreement are communicated to and understood by all relevant Seller personnel, suppliers, Subcontractors, and other permitted third parties.
   b. Seller will ensure that all individuals performing work under the Agreement are qualified to perform their duties in a professional and workmanlike manner. Seller will permit Buyer to review Buyer's procedures, practices, processes, and related documents to determine compliance with this Section. Seller will have a continuing obligation to promptly notify Buyer of any violation of or deviation from Seller's approved quality control system and to advise Buyer of the quantity and specific identity of any Goods delivered to Buyer during the period of any such violation or deviation.
   c. Seller will be responsible for performing inspections and quality checks at the location of any suppliers, Subcontractors, and other permitted third parties used to produce Goods, in accordance with the quality and inspection terms set forth in the BA. Seller will also conduct inspections and quality prior to shipment of the Products.
   d. Seller will establish and maintain a process to ensure that all Goods are completely traceable back to the location of manufacture.

   Environmental Health and Safety. Seller must maintain an environmental management system ("EMS") acceptable to Buyer. Seller's EMS will promote health and safety, environmental stewardship, and pollution prevention by appropriate source reduction strategies. Seller will convey the requirements of this Section to its Subcontractors, suppliers, and other permitted third parties.

   Non-Circumvention. Seller must not, directly or indirectly, except with the prior express written consent of Buyer: (i) enter into any transaction with any third party introduced to Seller by Buyer ("Introduced Party") similar to, in competition with, or which otherwise could have the effect of preventing Buyer from receiving the full benefit of the Agreement; (ii) solicit the Introduced Party to enter into any such transaction; or (iii) induce, solicit, procure, or otherwise encourage its employees, representatives, or any third party, or respond to any solicitation from any of the same, to enter into any such transaction.

5. In the event of a conflict between the Original Agreement and this Amendment, the following order of precedence will apply:
   a. This Amendment
   b. The Terms of Sale
   c. The Original Agreement

Except as set forth in this Amendment, the Original Agreement is unaffected and will continue in full force and effect in accordance with its terms.

AGREED:

**Footprint International, LLC**                    **Footprint Asia Limited**

Signature: _Stephen T. Birch_          Signature: _____

Name: _Stephen T. Birchmay_            Name: _Eugene chua_

Title: _Managing Director & Chief Legal Officer_   Title: _CEO_

Date: _____            Date: _4/11/2022_

Exhibit 3C

Store | Press Kit



Search   **Contact Us**   ☰

# PURCHASE ORDER TERMS AND CONDITIONS (GOODS AND SERVICES)

These terms and conditions ("Terms") apply to the extent the Parties are not otherwise subject to an applicable master agreement.

These Terms govern the purchase of goods ("Goods") and services ("Services") set forth in a purchase order that incorporates by reference these Terms ("Order") by and between Footprint International LLC, inclusive of its subsidiaries and affiliates ("Footprint"), and the seller identified on the Order ("Seller"), either or both of which may be referred to as a Party or the Parties, respectively. An Order, these Terms, and any change orders, attachments, exhibits, policies, specifications, supplements, schedules, or other terms attached to or referenced in a document provided by Footprint to Seller are collectively, the "Agreement."

## 1. ACCEPTANCE OF TERMS.

Seller accepts the Order issued by Footprint by (i) acknowledging the Order in writing; or (ii) beginning performance under such Order. By acceptance of an Order, Seller agrees to comply with all terms of the Agreement, unless otherwise agreed by the Parties in a signed writing. These Terms apply to everything in the Order and constitute Footprint's offer to Seller, which Footprint may revoke at any time prior to Seller's acceptance. Unless specifically agreed to by Footprint in a signed writing, Footprint rejects and is not bound by any terms and conditions different from or in addition to those contained in the Agreement, including any terms and conditions referenced in or attached to any document provided by Seller and incorporated into the Agreement.

## 2. GOODS AND SERVICES.

a) Goods. Seller will deliver Goods in the quantities and on the date(s) specified in the Order ("Delivery Date") and to the address specified in the Order, during Footprint's normal business hours or as otherwise instructed by Footprint. Seller will pack all Goods according to Footprint's instructions or, if there are no instructions, in a manner sufficient to ensure that Goods are delivered in an undamaged and otherwise satisfactory condition. Footprint may return any Goods delivered prior to the Delivery Date at Seller's risk and expense, and Seller will redeliver such Goods on the Delivery Date.

b) Services. Seller will provide Services to Footprint as described in and in accordance with the schedule set forth in the Order or as otherwise specified by Footprint. Seller will obtain, and at all times during the term of the Agreement maintain, all necessary licenses and consents and comply with all relevant laws.

c) Time of the Essence. Time is of the essence, and Seller will strictly adhere to the applicable schedules. Failure to perform in accordance with the Agreement, if unexcused, will constitute a material breach.

## 3. PRICE.

Footprint will pay the price(s) set forth in an Order issued by Footprint. If no price is set forth on the Order, pricing will be the lower of (i) the amount last quoted to Footprint; (ii) the price set forth in Seller's published price list in force as of the date of the Order; or (iii) the prevailing market price. Unless otherwise agreed by Footprint in the Order, pricing includes all applicable taxes and fees, including packaging, transportation, insurance, tariffs, and customs duties.

**URL**

https://www.footprintus.com/purchase-order-terms

**Timestamp**

Tue Jan 02 2024 10:38:39 GMT-0800 (Pacific Standard Time)

b) Services. Seller will provide Services to Footprint as described in and in accordance with the schedule set forth in the Order or as otherwise specified by Footprint. Seller will obtain, and at all times during the term of the Agreement maintain, all necessary licenses and consents and comply with all relevant laws.

c) Time of the Essence. Time is of the essence, and Seller will strictly adhere to the applicable schedules. Failure to perform in accordance with the Agreement, if unexcused, will constitute a material breach.

## 3. PRICE.

Footprint will pay the price(s) set forth in an Order issued by Footprint. If no price is set forth on the Order, pricing will be the lower of (i) the amount last quoted to Footprint; (ii) the price set forth in Seller's published price list in force as of the date of the Order; or (iii) the prevailing market price. Unless otherwise agreed by Footprint in the Order, pricing includes all applicable taxes and fees, including packaging, transportation, insurance, tariffs, and customs duties.

## 4. PAYMENT.

Seller will invoice Footprint for Services performed and Goods delivered pursuant to the Order. Footprint will pay invoices net sixty (60) days after receipt of a valid invoice, unless otherwise agreed by the Parties. Each invoice submitted by Seller must reference the Order, and Footprint may return incorrect invoices. Footprint may offset against any payment hereunder any amount owed to Footprint by Seller or its affiliates.

## 5. SHIPPING, TITLE, RISK OF LOSS.

Seller will ship Goods DDP (Incoterms 2020) to the Footprint location provided in the Order or as otherwise designated by Footprint in writing ("Delivery Point"). Title and risk of loss passes to Footprint upon delivery of the Goods at the Delivery Point. If Goods ordered are lost, damaged, or destroyed prior to title passing to Footprint, Footprint may (i) cancel all or part of the Order; or (ii) require delivery of substitute goods of equal quantity and quality. Such delivery will be made as soon as commercially practicable.

## 6. WARRANTIES.

a) Goods. For the longer of twenty-four (24) months from the date of delivery and the period provided in Seller's standard warranty, Seller warrants that Goods delivered will be free from defects in workmanship, design, production, manufacture, performance, and materials; (ii) conform to all terms of the Agreement; (iii) not infringe or misappropriate any third party's patent or other intellectual property rights; and (iv) not conflict with, or be prohibited in any way by, any other agreement to which Seller is bound or by any applicable law.

b) Services. For the longer of ninety (90) days from the date of completion of Services and the period provided in Seller's standard warranty, Seller warrants that Services will (i) be completed in a professional and competent manner, with the degree of skill and care that is required by applicable industry standards or practices; (ii) conform to all terms of the Agreement; (iii) not infringe or misappropriate any third party's patent or other intellectual property rights; and (iv) not conflict with, or be prohibited in any way by, any other agreement to which Seller is bound or by any applicable law.

c) Procedure. The warranties set forth in this Section are cumulative and in addition to any other warranty provided by law or equity. All warranties run to Footprint and its customers and survive any delivery, inspection, acceptance, or payment. If Footprint identifies a warranty problem during the warranty period, Footprint will promptly notify Seller, and Seller will, at Seller's cost and Footprint's option, promptly (i) either replace or repair the defective or nonconforming Goods and pay for all related expenses, including, but not limited to, transportation charges for the return of the defective or nonconforming goods to Seller and the delivery of repaired or replacement Goods to Footprint; or (ii) with respect to Services, repair or re-perform the Services. Replaced or repaired Goods will be warranted for the remainder of the warranty period or six (6) months, whichever is longer. Repaired or re-performed Services will be warranted for the remainder of the warranty period or thirty (30) days, whichever is longer.

## 7. INSPECTION, ACCEPTANCE.

Footprint will have a reasonable time after receipt and before payment to inspect the Goods or Services for conformity to the Agreement. If Goods or Services do not wholly conform to the Agreement, Footprint may (i) rescind the Agreement in its entirety; (ii) accept the Goods or Services at a reasonably reduced price; or (iii) reject the Goods or Services and require replacement or reperformance of the rejected Goods or Services. Payment does not constitute acceptance. Any payments made for Goods or Services subsequently found to be nonconforming will be refunded to Footprint within thirty (30) days after receipt of Footprint's notice of the nonconformance.

## 8. FACILITIES, TOOLS, ACCESS.

Unless otherwise specified in the Order, all services, facilities, materials, equipment, drawings, or other items necessary for the provision of Goods or Services are to be provided by Seller at no additional cost to Footprint. Any facilities, materials,

**URL**

https://www.footprintus.com/purchase-order-terms

**Timestamp**

Tue Jan 02 2024 10:38:39 GMT-0800 (Pacific Standard Time)

made for Goods or Services subsequently found to be nonconforming will be refunded to Footprint within thirty (30) days after receipt of Footprint's notice of the nonconformance.

## 8. FACILITIES, TOOLS, ACCESS.

Unless otherwise specified in the Order, all services, facilities, materials, equipment, drawings, or other items necessary for the provision of Goods or Services are to be provided by Seller at no additional cost to Footprint. Any facilities, materials, equipment, drawings, or other items which may be furnished or otherwise made available by Footprint will remain the property of Footprint and must be returned in as good condition as when furnished or otherwise made available, except for reasonable wear. To the extent necessary, Footprint will provide Seller reasonable access to Footprint's personnel and facilities. Seller will comply with all rules, regulations and policies of Footprint, including general health and safety procedures and applicable confidentiality obligations.

## 9. CHANGES.

Footprint may, at any time, by written instructions and/or drawings issued to Seller (each a "Change Order"), order changes to the Goods or Services. If such change increases or decreases the cost or time required to perform Services or deliver Goods, the Parties will negotiate an equitable adjustment in the price or schedule to reflect the increase or decrease. Unless otherwise agreed by Footprint, Seller must submit to Footprint a firm cost proposal for the Change Order within ten (10) business days after receipt of the Change Order. If Seller considers Footprint's conduct to constitute a change, Seller must notify Footprint promptly in writing. Pending written confirmation from an authorized representative of Footprint, Seller will take no action to implement such change.

## 10. INSURANCE.

Seller will obtain and maintain at all times during the term of the Agreement and require all suppliers, agents, and subcontractors to obtain and maintain at all times during the term of the Agreement such adequate health, auto, workers' compensation, unemployment compensation, disability, liability, and other insurance, as is required by law or as is the common practice in Seller's trade or business. Seller will include Footprint as an additional insured on its relevant policies. Upon request, Seller will provide Footprint with certificates evidencing coverage.

## 11. RECORDS.

Seller will maintain complete and accurate records relating to the Agreement, including records of the time spent and materials used. During the term of the Agreement and for a period of five (5) years thereafter, upon Footprint's written request, Seller will allow Footprint to inspect and make copies of such records.

## 12. CONFIDENTIALITY.

This Section will apply to the extent that the Parties are not otherwise subject to an active non-disclosure agreement that would govern the disclosure of Confidential Information with respect to the Goods or Services. "Confidential Information" means all non-public information that a Party knows or should reasonably know is confidential or proprietary. Confidential Information includes any information disclosed by one Party to the other Party, either directly or indirectly in writing, orally or by inspection of tangible or intangible objects or places (including, without limitation, intellectual property, trade secrets, research, product plans, products, services, equipment, customers, markets, software, inventions, processes, designs, drawings, hardware configuration information, pricing, marketing, business and financial information, and plans, prototypes, samples, data sets, or business premises), whether or not designated as "confidential" at the time of disclosure, and all notes, compilations and analyses relating thereto or derived therefrom. Confidential Information does not include any information that: (i) is or becomes publicly available without breach of the Agreement; (ii) can be shown by documentation to have been known to a Party at the time of its receipt from the other Party; (iii) is received from a third party who did not acquire or disclose the same by a wrongful or tortious act; or (iv) can be shown by documentation to have been independently developed without reference to the Confidential Information. Neither Party will disclose, use, modify, copy, reproduce or otherwise divulge Confidential Information of the other, except as required by law or in furtherance of the Agreement. Each Party will take reasonable measures to avoid disclosure, dissemination, or unauthorized use of Confidential Information, including, at a minimum, those measures taken to protect its own Confidential Information of a similar nature. Because of the unique and proprietary nature of the Confidential Information, it is understood and agreed that remedies at law for a breach of the obligations under this Section may be inadequate and that the owner of Confidential Information will be entitled to equitable relief (including without limitation provisional and permanent injunctive relief and specific performance) without the requirement to post any bond in addition to any other remedies. The obligations in this Section survive the expiration or termination of the Agreement.

## 13. OWNERSHIP OF WORK PRODUCT.

"Work Product" includes, without limitation, all designs, discoveries, creations, works, devices, masks, models, work in progress, deliverables, inventions, products, intellectual property, technologies, processes, computer programs, procedures, improvements, developments, drawings, notes, documents, information, and materials made, conceived, or developed by

**URL**

https://www.footprintus.com/purchase-order-terms

**Timestamp**

Tue Jan 02 2024 10:38:39 GMT-0800 (Pacific Standard Time)

termination of the Agreement.

## 13. OWNERSHIP OF WORK PRODUCT.

"Work Product" includes, without limitation, all designs, discoveries, creations, works, devices, masks, models, work in progress, deliverables, inventions, products, intellectual property, technologies, processes, computer programs, procedures, improvements, developments, drawings, notes, documents, information, and materials made, conceived, or developed by Seller alone or with others which result from or relate to the Goods or Services. All Work Product is and will remain the sole and exclusive property of Footprint. Seller hereby agrees to irrevocably assign and transfer to Footprint and does hereby assign and transfer to Footprint all of its worldwide right, title and interest in and to the Work Product including all associated intellectual property rights. Footprint will have the sole right to determine the treatment of any Work Product including, without limitation, the right to keep it as trade secret, execute and file patent applications on it, to use and disclose it without prior patent application, to file registrations for copyright or trademark in its own name or to follow any other procedure that Footprint deems appropriate. Seller agrees: (i) to disclose promptly in writing to Footprint all Work Product in its possession; (ii) to assist Footprint in every reasonable way, at Footprint's expense, to secure, perfect, register, apply for, maintain, and defend for Footprint's benefit all copyrights, patent rights, mask work rights, trade secret rights, and all other proprietary rights or statutory protections in and to the Work Product in Footprint's name as it deems appropriate; and (iii) to otherwise treat all Work Product as Footprint Confidential Information as described above. These obligations to disclose, assist, execute, and keep confidential survive the expiration or termination of the Agreement. All tools, equipment drawings, or other items furnished or otherwise made available by Footprint to Seller remain the sole property of Footprint. Seller will ensure that Seller's suppliers, agents, and subcontractors appropriately waive any and all claims and assign to Footprint any and all rights or any interests in any Work Product or original works created in connection with the Agreement. Seller irrevocably agrees not to assert against Footprint or its direct or indirect customers, assignees, or licensees any claim of any intellectual property rights of Seller affecting the Work Product. Footprint will not have rights to any works conceived or reduced to practice by Seller which were developed entirely on Seller's own time without using Footprint's equipment, supplies, facilities, input, or trade secrets or Footprint Confidential Information, unless such works relate to Footprint's business, or Footprint's actual or demonstrably anticipated research or development, or such works result from any Services performed by Seller for Footprint. Except as expressly provided in this Section, Seller hereby assigns, and will ensure that all Seller personnel assign, to Footprint all intellectual property or intellectual property rights that Seller and such personnel have in any Work Product (including all "moral rights", and where such assignment of moral rights is prohibited by applicable law, Seller hereby waives and covenants, and will ensure that all personnel waive and covenant, not to assert such rights it may have in the improvements, even after the termination of the Agreement), such assignment will be deemed to occur automatically whenever such automatic assignment is legally valid and binding and in all other cases Seller will ensure that such assignment occurs in a valid and legally binding manner at the earliest time possible.

## 14. COMPLIANCE WITH LAWS AND POLICIES.

a) General. Seller will comply with all applicable laws, rules, regulations, standards, and ordinances. Seller will refrain from any activity in connection with the Agreement that would constitute a violation by Footprint of the provisions of the Foreign Corrupt Practices Act ("FCPA"), the UK Bribery Act, the Export Administration Regulations, US Anti-Boycott regulations, and various US economic sanctions programs concerning certain countries and individuals administered by the US Treasury Office of Foreign Assets Control, or other applicable law regardless of U.S. jurisdiction over such activity.

b) Privacy. Seller will abide by the Footprint Privacy Policy made available to Seller, as amended from time to time.

c) Supplier Code of Conduct. Seller will comply with the Supplier Code of Conduct made available to Seller, as amended from time to time.

## 15. INDEMNITY.

Seller will indemnify, defend, and hold harmless Footprint and its subsidiaries, affiliates, successors, and assigns and each of its and their respective directors, officers, shareholders, employees, and agents from and against all claims, liabilities, damages, losses, penalties, fines, expenses, or other costs of any nature whatsoever (including, but not limited to, reasonable expenses, attorney's fees, court costs, investigations, litigation and settlement of any such claims) arising out of or in any way connected with (i) the Goods or Services; (i) any breach of any term, representation or warranty contained in the Agreement; (iii) any act or omission or willful misconduct of Seller or any Seller's suppliers, agents, or subcontractors; and (iv) any claim that the use or possession of Goods or Services infringes or misappropriates any patent, copyright, trade secret, or other intellectual property right of any third party. Seller will not enter into any settlement that requires Footprint to pay any amount or make any admission, without Footprint's prior written consent.

## 16. LIMITATION OF LIABILITY.

IN NO EVENT WILL FOOTPRINT'S LIABILITY FOR DIRECT DAMAGES TO SELLER OR SELLER'S SUPPLIERS, AGENTS, OR SUBCONTRACTORS, OR ANY THIRD PARTY EXCEED THE VALUE OF THE SPECIFIC GOODS OR SERVICES THAT IS THE SUBJECT MATTER OF THE DISPUTE. FURTHER, IN NO EVENT, REGARDLESS OF LEGAL THEORY, WILL FOOTPRINT BE LIABLE TO SELLER OR SELLER'S SUPPLIERS, AGENTS, OR SUBCONTRACTORS OR ANY THIRD PARTY FOR ANY INCIDENTAL

**URL**

https://www.footprintus.com/purchase-order-terms

**Timestamp**

Tue Jan 02 2024 10:38:39 GMT-0800 (Pacific Standard Time)

or make any admission, without Footprint's prior written consent.

## 16. LIMITATION OF LIABILITY.

IN NO EVENT WILL FOOTPRINT'S LIABILITY FOR DIRECT DAMAGES TO SELLER OR SELLER'S SUPPLIERS, AGENTS, OR SUBCONTRACTORS, OR ANY THIRD PARTY EXCEED THE VALUE OF THE SPECIFIC GOODS OR SERVICES THAT IS THE SUBJECT MATTER OF THE DISPUTE. FURTHER, IN NO EVENT, REGARDLESS OF LEGAL THEORY, WILL FOOTPRINT BE LIABLE TO SELLER OR SELLER'S SUPPLIERS, AGENTS, OR SUBCONTRACTORS OR ANY THIRD PARTY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES ARISING OUT OF, OR IN CONNECTION WITH, THE AGREEMENT, WHETHER OR NOT ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 17. FORCE MAJEURE.

Neither Party will be liable for any failure or delay in performance, to the extent that such failure or delay is caused by circumstances beyond its reasonable control and which makes such performance commercially impractical ("Force Majeure Event"). The Party asserting the existence of a Force Majeure Event must use diligent efforts to end and minimize the impact of the Force Majeure Event on the other Party and will resume performance of its obligations as soon as reasonably practicable after the removal of the cause. If a Force Majeure Event remains uncured for more than ten (10) days, the Party not asserting the Force Majeure Event may terminate the Agreement.

## 18. TERMINATION.

a) Mutual. Either Party may terminate an Agreement if (i) the other Party breaches any material term of the Agreement and fails to cure such breach within thirty (30) days' written notice from the non-breaching Party; or (ii) immediately if the other Party files a petition for bankruptcy, becomes insolvent, or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization, or assignment for the benefit of creditors. In the event of such termination, Footprint will pay Seller for Goods and Services accepted by Footprint through the date of termination.

b) By Footprint. Footprint may terminate all or part of an Agreement for any other reason upon thirty (30) days written notice to Seller. Footprint will be liable to Seller only for those Goods and Services provided through the date of termination, less appropriate offsets.

c) Procedure. Upon the expiration or termination any reason: (i) each Party will be released from all obligations to the other arising after the date of expiration or termination, except for those which by their terms survive such termination or expiration; and (ii) Seller will promptly notify Footprint of all Footprint Confidential Information or any Work Product in Seller's possession and, at the expense of Seller and in accordance with Footprint's instructions, will promptly deliver to Footprint all such Footprint Confidential Information and Work Product.

## 19. Miscellaneous

a) Notices. Except for an Order which may be electronically transmitted, all notices, and other communications will be in writing and considered given when: (i) delivered personally; (ii) sent by commercial overnight courier with written verification receipt; or (iii) five (5) days after having been sent, postage prepaid, by first class or certified mail. When providing notice to Footprint, Seller must also send an electronic copy to legal@footprintus.com.

b) Severability. If any provision of the Agreement is deemed invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability will not affect any other term or provision of the Agreement.

c) Assignment. Seller will not assign, delegate, transfer, or subcontract any of its rights or obligations under the Agreement without Footprint's prior written consent. Any attempt to assign, delegation, transfer, or subcontract without such written consent will be null and void. No assignment or delegation will relieve the Seller of any of its obligations.

d) Waiver A waiver of any default or of any term or condition of the Agreement will not be deemed to be a continuing waiver or a waiver of any other default or any other term or condition.

e) Publicity. Except as required by applicable law or pursuant to the rules of any applicable securities exchange, Seller may not make any public reference to Footprint, the Agreement, or the contemplated transactions, or otherwise use Footprint's name(s), trade name(s), logo(s), or mark(s) for any purpose without Footprint's prior written consent.

f) Relationship of the Parties. The Parties are independent contractors. Nothing in the Agreement will be construed as creating any agency, partnership, joint venture, employment, or other relationship between the Parties, and neither Party has the authority to bind the other Party in contract or otherwise.

g) No Exclusivity. The Agreement is non-exclusive and does not prevent either Party from entering into similar or same agreements with third parties.

h) No Third-Party Beneficiaries. The Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns. Nothing express or implied will confer upon any other person or entity any legal or equitable rights, benefits, or remedies.

**URL**

https://www.footprintus.com/purchase-order-terms

**Timestamp**

Tue Jan 02 2024 10:38:39 GMT-0800 (Pacific Standard Time)

authority to bind the other Party in contract or otherwise.

g) No Exclusivity. The Agreement is non-exclusive and does not prevent either Party from entering into similar or same agreements with third parties.

h) No Third-Party Beneficiaries. The Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns. Nothing express or implied will confer upon any other person or entity any legal or equitable rights, benefits, or remedies.

i) Survival. Any obligations and duties which by their nature extend beyond the expiration or termination of the Agreement will survive such expiration or termination, including those set forth in the following Sections: Warranties; Inspection, Acceptance; Insurance; Records; Confidentiality; Ownership of Work Product; Compliance with Laws and Policies; Indemnity; Limitation of Liability; Termination Procedure; and Miscellaneous.

j) Governing Law and Venue. The Agreement will be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflict of laws principles. Any dispute, action, or proceeding arising out of or relating to the Agreement will be brought in the state or federal courts located in Maricopa County, Arizona, which will have exclusive jurisdiction.

k) Entire Agreement; Modification. The Agreement contains the entire agreement and understanding of the Parties and supersedes all prior or contemporaneous negotiations and understandings with respect to the subject matter. The Agreement may be modified only by a written document signed by duly authorized representatives of each Party.



**FOOTPRINT**

**Follow us on Social Media**

**Main**
Science
Solutions

**Company**
About Us
Leadership
Board of Directors
History
Locations

**Resources**
News
Press Coverage
Blog
Media
Press Kit

**Initiatives**
Footprint Center

Copyright © 2023 Footprint | Privacy Policy

**URL**

https://www.footprintus.com/purchase-order-terms

**Timestamp**

Tue Jan 02 2024 10:38:39 GMT-0800 (Pacific Standard Time)