**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Footprint International, LLC, | No. CV-24-00093-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Footprint Asia Limited, et al., | |
| Defendants. | |

Plaintiff Footprint International, LLC asks the Court to enter a preliminary injunction against Defendants Eugene Chua and his companies Footprint Asia Limited ("FPA") and Shanghai Footprint Lvke Environmental Protection Technology Group Co., Ltd. ("G-COVE") (collectively "Defendants"). Doc. 5.[1] The motion is fully briefed, and the Court held an evidentiary hearing on February 20, 2024. For reasons stated below, the Court will deny Plaintiff's motion.

**I.  Factual Background.**

Plaintiff is a materials science technology company based in Gilbert, Arizona. It produces fiber-based products that include bowls, plates, cups, straws, cutlery, and food containers. Plaintiff's products are marketed and sold under its brand name, "Footprint." Doc. 5 at 2.

---

[1] Cary and Jennifer Newton are also Defendants, but their conduct is not at issue in this motion because they stipulated to a preliminary injunction. Doc. 31.

Plaintiff has adopted a distinctive logo featuring a foot, both alone and with the "Footprint" word mark. It also uses a distinctive leaf logo, both alone and with the "FOOTPRINT" word mark. *Id.*

Plaintiff contracted with Defendant FPA to produce Plaintiff's products at factories in China. In December 2021, Plaintiff and FPA executed a written Master Supply Agreement ("MSA") to govern their relationship. In October 2022, the parties executed an amendment to the MSA to update the Terms of Sale. According to Plaintiff, these Agreements confirm that: (1) FPA is merely a contractor and has no ownership interest in any of Plaintiff's products, trademarks, information, or other property; (2) FPA cannot use Plaintiff's name or any of Plaintiff's products, trademarks, or other property for any reason other than as directed by Plaintiff under the Agreements; and (3) FPA cannot independently solicit business, in competition with Plaintiff, from customers or other third parties to whom Plaintiff introduced FPA. The Agreements also provide that FPA cannot disclose, use, modify, copy, reproduce, or otherwise divulge Plaintiff's Confidential Information – including intellectual property, products, equipment, customers, markets, designs, and pricing – except as required by law or in furtherance of the Agreements. Doc. 5 at 3-4.

Plaintiff contends that Defendants are infringing Plaintiff's marks in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125. It also alleges that Defendants are unlawfully using Plaintiff's confidential information in violation of the Agreements. Plaintiff asks the Court to preliminarily enjoin Defendants from using its marks or any confusingly similar mark for any purpose in commerce, enjoin Defendants from using, disclosing, copying, or divulging Plaintiff's confidential information or equipment, and order FPA to immediately return Plaintiff's tools to Plaintiff in China. Doc. 5 at 1, 9-17.

This order will address three issues: (1) whether the Court can rule on a request for Rule 65 preliminary injunctive relief solely on the basis of notice to Defendants; (2) whether Plaintiff's claims are unlikely to succeed on the merits because the Court cannot obtain personal jurisdiction over Defendants; and (3) whether Plaintiff has shown a likelihood of success on the merits of its trademark and contract claims. The Court

1 concludes that notice alone provides a sufficient basis for addressing Plaintiff's motion, that it likely can assert personal jurisdiction over Defendants, and that Plaintiff has not at this stage carried its burden of showing a likelihood of success on the merits.

## II. Notice Alone Provides a Basis for Ruling on Plaintiff's Motion.

Rule 65 provides that "[t]he court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a). As courts have explained, "Rule 65(a) does not require service of process, but rather requires notice to the adverse party." *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co., Ltd.*, 80 F.4th 536, 542 (5th Cir. 2023) (cleaned up) (citing *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 302 (5th Cir. 1978)); *see also H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 842 (7th Cir. 2012) (court may issue preliminary injunctive relief on notice alone, without awaiting service of process on a foreign defendant under the Hague Convention); *Nail All., LLC v. Vishine Enter. Ltd.*, No. SA CV 2200937, 2022 WL 3013154, at *3 (C.D. Cal. June 15, 2022) ("Under Fed. R. Civ. Proc. 65(b), the Court has authority to issue interim injunctive relief pending service of process on foreign defendants through the Hague.").

The cases cited by Defendants in opposition to this conclusion either granted preliminary injunctive relief, *see Nail All., LLC*, 2022 WL 3013154, at *3; *Bailey v. Nurmi*, No. 3:19-cv-07669, 2019 WL 6682529, at *2-3 (N.D. Cal. Dec. 6, 2019), or failed to address Rule 65 in any detail, *see FitTrack, Inc. v. Hyperzoo Tech. Ltd.*, No. 23-cv-0838, 2023 WL 4674307, at *2 (S.D. Cal. July 20, 2023); *Acolyte Techs. Corp. v. Jeja Int'l Corp.*, No. 11 CV 2012, 2012 WL 273159, at *1 (S.D. Cal. Jan. 30, 2012).

Defendants ask the Court to reconsider its previous order permitting service by the alternative method of email, arguing that full compliance with the Hague Convention is required. Docs. 19, 36. The Court has ordered further briefing on this issue. Doc. 49. Even if the Court ultimately concludes that service has not been completed and the Hague Convention must be followed, Rule 65 grants the Court authority to rule on Plaintiff's motion now because Defendants clearly have received notice of the motion.

/ / /

**III.    Defendants' Contacts Likely are Sufficient for Personal Jurisdiction.**

Defendants have not filed a motion to dismiss for lack of personal jurisdiction. They instead appear to argue that Plaintiff cannot show a likelihood of success on the merits because personal jurisdiction over Defendants, all of whom are based in China, cannot be obtained by the Court.

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Arizona's long-arm statute "provides for personal jurisdiction co-extensive with the limits of federal due process." *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1050 (9th Cir. 1997). Thus, courts in this District may exercise jurisdiction "over a defendant who is not physically present in Arizona if the defendant has minimum contacts with the State, such that the suit can be maintained without offending traditional notions of fair play and substantial justice." *Carpenter v. All Am. Games*, No. CV16-01768, 2017 WL 1090706, at *1 (D. Ariz. Mar. 23, 2017).

Specific jurisdiction exists where (1) the defendants purposefully direct their activities or consummate some transaction with the forum, or perform some act by which they purposefully avail themselves of the privilege of conducting activities in the forum; (2) the claims arise out of the defendants' forum-related activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice, i.e., it is reasonable to exercise jurisdiction. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Once a plaintiff satisfies the first two prongs, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (citation omitted).

Defendant FPA has consented to jurisdiction in Arizona. Doc. 5-2 at 13-14. And evidence presented at the preliminary injunction hearing shows that Defendants Chua, FPA, and G-COVE have made significant contacts with Arizona related to the event at issue in this case. *See, e.g.*, Ex. 15 (May 23, 2023 email from FPA to Newton, attaching G-COVE documents reflecting numerous shipments of product to Arizona); Ex. 18 (same,

June 6, 2023 email); Ex. 28 (same, Nov. 11, 2023 email); Ex. 29 (same, Nov. 15, 2023 email); Ex. 31 (same, Nov. 21, 2023 email). The evidence also shows many communications from Defendants to Newton in Arizona. *See, e.g.*, Exs. 5, 12, 20. Additionally, Defendant Chua travelled to Arizona on several occasions in connection with his business with Plaintiff, and even alleges that he was part of the "family" of individuals who were involved in the Arizona-based business. *See* Docs. 30 at 2, 31-1 at 2 ¶ 3.

Given these and other contacts, the Court is likely to find that Defendants purposefully directed their activities to Arizona and availed themselves of the privilege of doing business here. This lawsuit arises out of those activities, and Defendants have not shown that exercising jurisdiction in this Court would be unreasonable.

**III.   Likelihood of Success on the Merits.**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All four elements must be satisfied. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022). "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

**A.   Plaintiff's Claims.**

Plaintiff seeks preliminary injunctive relief on two claims, trademark infringement and breach of the Agreements' confidentiality provisions. To prevail on its trademark claim, Plaintiff must show that (1) it has a valid, protectible ownership interest in the marks, and (2) Defendants' use of the marks is likely to cause consumer confusion. *Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007). For purposes of this order, the Court will focus on the second factor. In arguing that it has shown a likelihood of confusion, Plaintiff asserts that Defendants have intentionally infringed its marks and have

used identical marks, giving rise to a presumption of confusion. Doc. 5 at 12-15. Plaintiff also addresses the factors set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979). *Id.* The Court will focus primarily on whether Plaintiff has shown intentional infringement and whether the customers involved were likely to have been confused.

For breach of contract, Plaintiff must demonstrate (1) a contractual obligation, (2) a breach of that obligation, and (3) resulting damage. *Greenstar, LLC v. Heller*, 934 F. Supp. 2d 672, 686 (D. Del. 2013).[2] The Court will focus on Plaintiff's evidence of breach.

### B.     Relevant Facts.

The parties submitted declarations and exhibits in connection with their briefing, and also introduced many exhibits during the February 20, 2024 hearing. They presented live testimony at the hearing by Collin Euteneuer, Plaintiff's Vice President of Product Management, and Defendant Cary Newton, Plaintiff's former Senior Vice President of Sales.

Plaintiff admits that it encountered financial difficulties in late 2022 and early 2023. In a pending state court action against Newton, Plaintiff disclosed that between November 2022 and June 2023 it "scaled back the goods and services it provided to certain customers with the understanding [it] would resume full services upon completion of a recapitalization of the company." Ex. 123 at 2. Customers affected by this development, as designated in Plaintiff's motion by number, included Customers 1, 2, and 3. *Id.* Euteneuer testified that Customer 5 was also affected.[3]

Newton testified that Plaintiff's financial difficulties created "havoc" with customers; Euteneuer testified that it made things a "little chaotic." Plaintiff disclosed in the state court case that Customer 1 said it would no longer do business with Plaintiff in June 2023. *Id.* at 3. Customer 2's contract with Plaintiff expired in March 2023 and was not renewed. *Id.* at 4. Customer 3 said it would no longer do business with Plaintiff in

---

[2] Plaintiff asserts that this case is governed by Delaware law, citing Terms of Sale § 19(j). Doc. 5 at 15. For purposes of this order, the Court will assume Plaintiff is correct.

[3] Plaintiff's motion also discusses Customers 4 and 6, but the reply makes clear that it is not relying on these customers to support its motion. Doc. 40 at 11.

March 2023, and terminated its contract with Plaintiff in July 2023. *Id.* at 3. Euteneuer testified that Plaintiff stopped supplying Customer 5 in the first or second quarter of 2023.

These circumstances are relevant to what Plaintiff and Defendants were doing during the times at issue in this case. The Court will also consider the evidence presented about each of the four customers focused on in Plaintiff's motion.

### 1. Customer 1.

Customer 1 was a client of Plaintiff from 2019 to June 2023. It ordered 2S and 20S trays from Plaintiff and used them to package its products for sale in U.S. grocery stores. Doc. 1, ¶¶ 130-31. Newton testified that 2S and 20S are designations for standard sizes and are not unique to Plaintiff.

Will Stevens, one of Plaintiff's internal sales representatives, states in a declaration that he visited two Trader Joe's stores in Arizona on January 10, 2024 and saw Customer 1 trays that were "nearly identical" to the 2S and 20S trays Plaintiff supplied Customer 1. Doc. 5-1 at 9-10. He "purchased several of these products, removed the outer packing, and then inspected, photographed, and preserved the trays." *Id.* The trays and photographs have not been presented as evidence to support Plaintiff's request for injunctive relief.

Brandon Moore, a Vice President of Design for Plaintiff, avowed in a declaration that he physically inspected or looked at photographs of the trays and is confident they were created with Plaintiff's designs. Doc. 5-1 at 6. He says that unidentified "unique" design elements lead to his conclusion, along with the fact that one of the trays bears Plaintiff's marks. *Id.*

Newton testified that Customer 1 was one of the accounts Plaintiff could not service when it ran into financial trouble in early 2023. He asserts in his state court disclosure that he was assigned by Plaintiff to tell Customer 1 that Plaintiff could not keep its commitments and that Customer 1 should try to find alternative sources for its trays. Ex. 36 at 7. Newton states that Customer 1 contacted him after he stopped working for Plaintiff in early March and told him Trader Joe's insisted that Customer 1 deliver its product on non-plastic trays, produced by a company other than Plaintiff, or Trader Joe's would cancel

its account. *Id.* Customer 1 asked Newton for help. In response, Newton asked Defendant Chua if he could provide trays to Customer 1. Chua was able to provide trays and delivered the first order in June 2023. Customer 1 reported to Newton that Chua's trays had Plaintiff's logo – something Trader Joe's did not want – and Newton immediately instructed Chua to stop providing trays with the logo. *Id.* By this time another order had shipped, but FPA thereafter eliminated the logo. *Id.*

Chua tells a similar story. He avows that Newton contacted him about helping supply Customer 1 when Plaintiff ran into financial trouble, and Chua assumed it was like the Customer 3 situation described below. Ex. 124, ¶¶ 33-34. Chua explains that Plaintiff had arranged for him to manufacture trays for Customer 1, the trays were produced with Plaintiff's marks, but the trays were not shipped because of Plaintiff's financial problems. *Id.* ¶ 34. Chua shipped some of the trays to Customer 1 in response to Newton's request, and was then told by Newton that Customer 1 did not want trays that bore Plaintiff's logo. *Id.* ¶ 35. Chua asserts that the last shipment bearing Plaintiff's marks was sent in July 2023, and that shipments thereafter have not born Plaintiff's marks and have been made with FPA's tools using FPA's designs. *Id.* ¶¶ 36-37.

The Court reaches the following preliminary conclusions from this evidence: (1) Plaintiff was in financial trouble in early 2023 and could not meet Customer 1's demands; (2) Newton advised Customer 1 of this fact; (3) Customer 1 reached out to Newton after he had stopped working for Plaintiff and told him that it needed non-plastic trays produced by a company other than Plaintiff; (4) Newton reached out to Chua to provide the trays; (5) Chua delivered trays produced at Plaintiff's request, with Plaintiff's marks, that were stalled in transit due to Plaintiff's financial troubles; (6) Chua and Newton removed Plaintiff's logo at Customer 1's request.

One factual dispute is whether Chua intentionally used Plaintiff's marks as though they were his own, or whether he instead believed he was stepping in to help Plaintiff while still part of Plaintiff's family as he was asked to do for Customer 3 discussed below. Chua asserts the latter in his sworn declaration, and Plaintiff provides no direct evidence to the

contrary. On these facts, and on the trademark claim, the Court cannot find a likelihood of intentional infringement that would give rise to a presumption of confusion. Nor can the Court conclude that Customer 1 was likely to be confused into believing the trays came from Plaintiff given the circumstances described above, including that Customer 1 was seeking to avoid Plaintiff's trays. Plaintiff has not shown a likelihood of success on its trademark claim related to Customer 1.

A second factual dispute is whether the trays produced by FPA after mid-2023 were made with Plaintiff's or FPA's tools and designs, giving rise to a breach of the confidentiality provisions. Moore and Chua provide conflicting declarations on this point, and the Court has no evidence with which to determine who is right. Plaintiff has not provided evidence from which the Court can conclude that it is likely to prevail on the merits of its breach of contract claim related to Customer 1.

### 2. Customer 2.

Plaintiff alleges that it provided trays to Customer 2 in high volumes until June 2023, when Customer 2 stopped ordering them. Doc. 1, ¶¶ 150-51. Plaintiff alleges that its VP of Human Resources visited a Customer 2 store in California in September 2023 and saw "trays that resembled [Plaintiff's] and bore [Plaintiff's] Marks." *Id.* ¶ 152. Plaintiff alleges on information and belief that the trays were not made at Plaintiff's request because they "were no longer in stock based on the timing of those sales." *Id.* ¶ 153. Plaintiff therefore contends that the trays were counterfeits made by FPA without Plaintiff's consent. *Id.* ¶ 155.

Plaintiff has not presented the allegedly counterfeit trays as evidence to support this motion, and Euteneuer testified that he does not know if the trays were collected or preserved. He also testified that Plaintiff did not ask Customer 2 to identify the source of the trays, and that Plaintiff's conclusion that they were not Plaintiff's trays was based on Plaintiff's inventory, not Customer 2's. Euteneuer knew of no other evidence in support of the Customer 2 allegation.

Chua's declaration flatly denies that Defendants have provided product to Customer 2 outside of the MSA. Ex. 124, ¶ 42.

One might plausibly conclude that the trays allegedly seen at Customer 2's store in September 2023 were made by Defendants outside the MSA if they could not be explained by Plaintiff's inventory numbers, but this inference does not rise to proof of a likelihood of success. Furthermore, Plaintiff has provided no evidence of intentional infringement to support a presumption of confusion, and it appears unlikely that Customer 2, which had terminated its relationship with Plaintiff, would have been confused into believing it was again doing business with Plaintiff. In the absence of the actual trays, and in light of the direct dispute of facts between the parties, the Court cannot at this point find a likelihood that Plaintiff will prevail on its claims related to trays in Customer 2's store.

          **3.**      **Customer 3.**

Plaintiff asserts that Customer 3 ordered more than 20 million bowls and lids from Plaintiff to use in its U.S. restaurants. Doc. 1, ¶ 159. Plaintiff alleges that FPA, at the request of Newton, provided bowls directly to Customer 3 that bore Plaintiff's marks and confidential information. *Id.* ¶ 161.

Newton testified that Plaintiff's management, during the 2022-2023 financial difficulties and while Newton was still at the company, encouraged Newton and others to help Plaintiff's customers find a "soft landing" – to help them find other ways to meet their product needs. Newton further testified that Customer 3 reached out to Newton when it was unable to obtain products that had been produced by Defendants at Plaintiff's request, but that were stalled in transit (in China and at U.S. ports) because of Plaintiff's financial difficulties. Customer 3 was considering suing Plaintiff, but reached out to Newton to see if he could help free up the stalled products so they could be shipped to Customer 3.

Chua provides the same facts in his declaration. Ex. 124, ¶¶ 23-24. Chua further asserts that the shipping difficulties were in part because Plaintiff owed FPA $4 million in unpaid invoices. *Id.*

Newton testified that he referred Customer 3 to a company called Navigate, which was able to work with Chua and FPA to release the shipments to Customer 3. Chua agrees. *Id.* ¶ 25. Given this evidence, the Court cannot conclude that Plaintiff is likely to show that Defendants intentionally infringed Plaintiff's marks, giving rise to a presumption of confusion, or likely to show that Customer 3 was confused about the source of the products. And since it appears the products shipped to Customer 3 were made at Plaintiff's request, Plaintiff is not likely to show that they were made in violation of the confidentiality provisions.

At the hearing, Plaintiff introduced Exhibit 5, a March 2023 email thread and attachments, in which Newton and Defendants responded to Customer 3's Request for Information (RFI) about their ability to produce bowls for Customer 3 in the future. Plaintiff suggested during the hearing that Newton and Defendants responded to the RFI by proposing to sell Customer 3 Plaintiff's proprietary bowls, as illustrated by the fact that their RFI response attached drawings of Plaintiff's bowls with Plaintiff's logo and confidential information. But this appears to be a misreading of Exhibit 5. The RFI states that it is vetting new suppliers for both semi-custom and fully proprietary bowls and lids. *Id.* at 5. It lists ideal specifications for the new products. *Id.* In response, Defendants say that they will provide 32-ounce bowls for sampling and testing, and they provide a schedule for producing these prototypes. *Id.* at 6-7.

The RFI specifically asks the applicants to provide photos, renderings, and design drawings of "current available bowl designs." *Id.* at 7. This appears to be a request for information about products the applicants currently were making, not the prototypes they would produce in response to the RFI. The attached drawings, which include Plaintiff's marks and designs, were bowls Defendants made for Customer 3 and appear to have been provided in response to this specific request, not as a proposal to make Plaintiff's bowl for the customer in the future. This reading is confirmed by the fact that Defendants remind Customer 3 that bowls are being "suppl[ied] by us currently." *Id.* at 8.

Newton gave this explanation for Exhibit 5 during the hearing, and Plaintiff presented no contrary evidence. Newton also testified that he and Defendants were not awarded a contract in response to their RFI proposal.

The Court cannot conclude that Exhibit 5 is evidence of Defendants attempting to sell Plaintiff's products to Customer 3. The drawings of Plaintiff's products appear to have been provided as examples of production Defendants had performed for Customer 3. Such a submission would not have confused Customer 3 into believing Newton and Defendants were Plaintiff – a company with which it had stopped doing business. And because the drawings concerned Customer 3's own bowls, they presumably did not convey confidential information Customer 3 had not already received from Plaintiff.

### 4. Customer 5.

Plaintiff alleges that it has provided bowls to Customer 5 since February 2020. Doc. 1, ¶ 178. It claims that one of its sales representatives visited one of Customer 5's locations in April, May, and October 2023 and saw bowls that were identical to Plaintiff's and bore Plaintiff's name and marks. *Id.* ¶ 181. The bowls have not been placed in evidence. Plaintiff alleges on information and belief that it did not provide the bowls given stock levels and the timing of sales. *Id.* ¶ 182.

Defendants introduced an email from Plaintiff's Chief Revenue Officer, Jeff Bassett, dated January 15, 2023, in which Bassett introduces Customer 5 directly to Chua to establish a direct-shipping arrangement between Customer 5 and Defendants. Ex. 110. Bassett instructs Customer 5 that purchase orders and prepayment "will need to be issued direct to [FPA] so as to avoid the internal cash restrictions associated with Footprint International." *Id.* He states that Chua "is working on pulling together max. capacity and pricing for direct shipment." *Id.* Euteneuer testified that this email was part of Plaintiff's effort to move customers to a direct-shipment model, under which they would receive product directly from the manufacturer and avoid the financial difficulties being experienced by Plaintiff.

This evidence shows that, in early 2023, *Plaintiff* arranged for Customer 5 to receive bowls directly from Defendants, which would include Plaintiff-branded bowls, consistent with what the sales representative saw in Customer 5's stores later in 2023. Plaintiff provides no evidence from which the Court can conclude that the bowls seen by the sales representative were infringing counterfeits instead of bowls provided under the direct shipments arranged by Plaintiff.

### 5. Other Evidence.

During the hearing, Plaintiff introduced Exhibits 23, 25, 28, 29, and 31. These exhibits relate to Newton's efforts to procure business from Giorgio Mushroom Company, with Defendants acting as the manufacturer. Giorgio is not one of the customers Plaintiff focused on in this motion.

In several updates regarding this marketing effort, FPA reports on progress to Newton and, among other things, notes that it must "Remove FP logo" from samples being sent to the prospective customer. *See, e.g.*, Ex. 28 at 4. Plaintiff asked Newton whether this demonstrated that FPA was using Plaintiff's tools to make the sample, but Newton did not know. He stated that he did not direct FPA on which tools to use and did not know whether FPA was using Plaintiff's or its own tools. Elsewhere, Defendant Chua asserts that he used his own tools to provide Plaintiff's product when Plaintiff's tools wore out. Ex. 124, ¶ 34. Again, although these exhibits might support an inference that Plaintiff's tools were being used, the Court does not find an inference sufficient to show a likelihood of success adequate to support injunctive relief.

Similarly, Plaintiff presented evidence through Euteneuer that Defendant G-COVE's original webpage included photographs of several trays designed by Plaintiff. *See* Exs. 39, 40. Plaintiff's marks were not visible in the photographs, and Plaintiff presented no evidence that Defendants have in fact produced the trays for customers.

Plaintiff also alleges that "multiple factories" have been confused as a result of Defendants' activities, but Plaintiff cites no evidence in support of this allegation and does

1  not identify the factories or the circumstances under which they were confused. *See* Doc. 5
2  at 10; Doc. 1, ¶ 208.

3  Finally, Plaintiff alleges that Defendants FPA and Chua have taken at least 20 of
4  Plaintiff's designs and have submitted patent applications for them in China, falsely
5  claiming that FPA (or Chua) invented or owns the designs. Doc. 1, ¶ 197. But Plaintiff
6  provides no additional information – no evidence or description of the proposed patents or
7  their subject, or of Defendants' efforts to pass them off as their own inventions.

8  The evidence presented by Plaintiff, including the additional evidence described in
9  this section, raises suspicions that Defendants are attempting to use Plaintiff's marks and
10 designs in their new business. This suspicion is bolstered by the fact that G-COVE's new
11 logo is quite similar in appearance to Plaintiff's leaf mark, and that G-COVE's original
12 website included a photograph of a building with Plaintiff's name on it and photographs of
13 Plaintiff's products. But suspicions are not enough to show that Plaintiff is likely to prevail
14 on the merits of its trademark infringement and breach of contract claims. The evidence
15 raises factual issues about whether Defendants have engaged in wrongful conduct – issues
16 that justify this litigation – but Plaintiff has not at this stage made the "clear showing"
17 required for preliminary injunctive relief. *Lopez*, 680 F.3d at 1072.

18 **6.  Sliding Scale Analysis.**

19 Under Ninth Circuit law, if a plaintiff can only show that there are "serious
20 questions" going to the merits – a lesser showing than a likelihood of success on the merits
21 – a preliminary injunction may still issue if the "balance of hardships tips *sharply* in the
22 plaintiff's favor" and the other two factors are satisfied. *Shell Offshore, Inc. v. Greenpeace,*
23 *Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013). "Serious questions are 'substantial, difficult and
24 doubtful, as to make them a fair ground for litigation and thus for more deliberative
25 investigation.'" *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)
26 (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1952)).
27 Plaintiff cites this standard but does not address it in any detail. Doc. 5 at 10-11.
28

Plaintiff's evidence and allegations present a fair ground for litigation. These serious questions are not sufficient for preliminary injunctive relief, however, because Plaintiff has not shown that the balance of hardships tips sharply in its favor or that it is likely to suffer irreparable harm.

Plaintiff relies on a presumption of irreparable harm. *See* Doc. 5 at 16. That presumption arises, however, only "upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction." 15 U.S.C. § 1116(a). Because Plaintiff has not shown a likelihood of success on the merits, it is not entitled to this statutory presumption.

Plaintiff cites two other examples of irreparable harm.

First, Plaintiff contends that it "has already lost Customers 1, 2, 3, and 4 as a result of Defendants creating competing businesses, misappropriating Footprint's proprietary and confidential information, Marks, designs, and tools, and soliciting Footprint's customers in contravention of the Agreement and the law." Doc. 5 at 17. But the evidence discussed above suggests that Plaintiff lost Customers 1, 2, and 3 because it could not fill their orders when it ran into financial trouble in late 2022 and early 2023, and Plaintiff states that it does not rely on Customer 4 in this motion. Doc. 40 at 11.

Second, Plaintiff contends that Defendants produced plastic-lined trays for Customer 2 using Plaintiff's marks, an action that will damage Plaintiff's reputation for producing only plastic-free products. Doc. 5 at 17. But as discussed above, Plaintiff has not produced sufficient evidence to show a likelihood of success on its claims with respect to Customer 2. Because Plaintiff has not shown it is likely to prove that Defendants made plastic-lined trays for Customer 2, the Court cannot find that it is likely to suffer irreparable harm from Defendants' production of such trays.

Plaintiff presents no other evidence of harm, such as lost customers, lost sales, or injuries to reputation. Thus, even though Plaintiff has raised serious questions, it is not entitled to injunctive relief because it has not shown that the balance of hardship tips sharply in its favor or that it is likely to suffer irreparable harm.

**IT IS ORDERED:**

1. Plaintiff's motion for a preliminary injunction (Doc. 5) is **denied**.

2. The Court will rule on the motion for reconsideration and the motion for a protective order (Docs. 36, 38) after they are fully briefed.

Dated this 26th day of February, 2024.

*David G. Campbell*

David G. Campbell
Senior United States District Judge